[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**AUGUST 22, 2003**
**THOMAS  K. KAHN**
**CLERK**

No. 01-17158

D. C. Docket No. 01-00201 CR-BU-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHITTAKONE CHANTHASOUXAT,

Defendant-Appellant.

No. 01-17163

D.C. Docket No. 01-00201 CR-BU-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEOPASEUTH XAYASANE,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Alabama

(August 22, 2003)

Before DUBINA, MARCUS and GOODWIN*, Circuit Judges.

DUBINA, Circuit Judge:

Chittakone Chanthasouxat ("Chanthasouxat") and Keopaseuth Xayasane ("Xayasane") (collectively, "Defendants") appeal their convictions for drug-related offenses. Specifically, Chanthasouxat and Xayasane argue that the district court erred in denying their motions to suppress drug evidence and statements obtained pursuant to a stop for an alleged traffic violation and a subsequent detention. For the reasons that follow, we reverse.

## I. BACKGROUND

Chanthasouxat was driving a van in which Xayasane was a passenger, traveling from Texas to North Carolina. Officer Phillip T. Carter ("Officer

_____
*Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Carter") of the Birmingham, Alabama Police Department, testified that he stopped the van in Alabama for failure to have an inside rear-view mirror. Officer Carter asked Chanthasouxat to step out of the van and stand behind it. He then questioned Chanthasouxat, who stated that he and Xayasane were driving back to North Carolina after having attended a party in Texas. Chanthasouxat told Officer Carter that a friend had loaned Defendants the van. Apparently, Chanthasouxat could not remember the friend's full name, so Officer Carter recorded the friend's name only as "Honroe." Officer Carter then questioned Xayasane, who stated that he and Chanthasouxat had been at an engagement party for Chanthasouxat's sister. Officer Carter observed that Xayasane appeared to be nervous and that one of his eyes was twitching.

Officer Carter placed Chanthasouxat in the patrol car and informed him that he would receive a citation for failure to have an inside rear-view mirror. Officer Carter then asked Chanthasouxat if he was carrying drugs and if the police could search the van. The patrol car was equipped with a video recorder, and the tape demonstrates that Officer Carter did not display his weapon or use any force or threats when he asked Chanthasouxat if he could search the van. Chanthasouxat agreed to the search. Officer Carter then asked Xayasane to join Chanthasouxat in the patrol car and called for back-up. After additional officers arrived, the police

searched the van and found approximately fifteen kilograms of cocaine. While Chanthasouxat and Xayasane were in the patrol car, the patrol car video camera recorded their discussion of how they would reconcile their stories. Their conversation also demonstrated that they knew they were carrying cocaine.

The government charged Chanthasouxat and Xayasane with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Defendants filed motions to suppress the evidence seized at the traffic stop and all of their statements on the grounds that Officer Carter did not have probable cause or reasonable suspicion to stop the van or search its interior. Chanthasouxat also contended that his consent to the search was not knowing, intelligent, or voluntary. Xayasane argued that the traffic citation was a pretext and that the Defendants were stopped because they were foreigners driving a van with Texas license plates. Xayasane also claimed that there was no Alabama or Birmingham law requiring a vehicle to have an inside rear-view mirror. He argued that, without probable cause or reasonable suspicion as grounds for the traffic stop, any evidence obtained from the stop was "fruit of the poisonous tree," and therefore should be suppressed. In addition, Xayasane contended that Officer Carter should

4

have informed Defendants of their right to refuse consent to the search of the van,[1] and that, given the fact that English is not Defendants' native language, Officer Carter should have made it clear that Defendants' consent to the search was optional.

Chanthasouxat reiterated Xayasane's arguments and asserted that the detention after the traffic stop was invalid under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). He also argued that the questioning was improper because, while a detention and any subsequent questioning must be reasonably related to the reason for the traffic stop, Officer Carter's questions were not. Chanthasouxat disputed the government's claim that Officer Carter had probable cause for the traffic stop under the totality of the circumstances. Moreover, he asserted that any consent to a search was tainted. Thus, any evidence obtained from the search was inadmissible under the exclusionary rule requiring courts to exclude evidence gathered by violating a defendant's Fourth Amendment rights. *Terry*, 392 U.S. at 12-13, 88 S. Ct. at 1875.

In response to Defendants' motions to suppress, the government argued that the Alabama Code required inside rear-view mirrors. Thus, because

---

[1]We question whether Xayasane may challenge Chanthasouxat's consent to the van's search. Xayasane had no expectation of privacy in the van in which he was a passenger. *See Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

Chanthasouxat's vehicle had no inside rear-view mirror, Officer Carter had probable cause to believe that a traffic violation had occurred. Pointing to Rule 20 of the Birmingham City Magistrate's fine schedule, the government also contended that the twenty dollar fine for "improper or no rear-view mirror" supported its position that the Defendants did, in fact, violate Birmingham's traffic code. In addition, the government argued that once Officer Carter properly stopped the van, Officer Carter's questioning of the Defendants was also proper. From the Defendants' answers to his questions, Officer Carter formed an articulable suspicion of other illegal activity. The government noted that an officer conducting a routine traffic stop may request a consent to search a vehicle. The government also asserted that there were no coercive police procedures and that, viewing the totality of the circumstances, Chanthasouxat's consent to the search was voluntary. Finally, the government contended that the police are not required to inform Defendants that they have the right to refuse consent to a search.

At an evidentiary hearing on the motions to suppress, Officer Carter was the only witness for the government. He testified, among other things, that his duties involved highway patrol and narcotics investigations and that he often stopped vehicles for violations of traffic laws on the interstate and then interviewed the

6

individuals he stopped.  On cross-examination, Officer Carter testified that he wrote the citation at issue under section 10-11-5 of the Birmingham City Code. That section states as follows:

> No person shall drive on any street of the city a motor vehicle which is so constructed or loaded as to prevent the driver from obtaining a view of the street to the rear by looking backward from the driver's position unless that vehicle is equipped with a mirror so located as to reflect to the driver a view of the streets for a distance of at least 200 feet of the rear of the vehicle.

Birmingham City Code §10-11-5.  Officer Carter acknowledged that this section did not specify that vehicles must have inside rear-view mirrors.  He further acknowledged that there were no state statutes that specifically required that vehicles have inside rear-view mirrors.  The Code of Alabama provides only that "[e]very motor vehicle, operated singly or when towing any other vehicle, shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such motor vehicle."  Ala. Code § 32-5-214 (2002).

7

However, Officer Carter stated that a city magistrate had told him that the failure to have an inside rear-view mirror is a violation under section 10-11-5. More specifically, Officer Carter testified that he considered the lack of an inside rear-view mirror a violation based on his training, the magistrate's interpretation of the statute, and the fact that he had written over 100 tickets for the same violation.

After hearing all of the evidence, the district court denied the Defendants' motions to suppress. Specifically, the district court determined that, based on Officer Carter's training, his instructions from a magistrate concerning the interpretation of section 10-11-5, and his history of having written more than 100 traffic citations for the same violation, Officer Carter had probable cause to stop the Defendants' vehicle. Both Chanthasouxat and Xayasane subsequently entered conditional pleas of guilty, reserving the right to appeal the denials of their motions to suppress. The district court sentenced each defendant to concurrent terms of sixty months imprisonment. Chanthasouxat and Xayasane then perfected their appeals.

## II. ISSUES

A. Whether the district court erred in finding that Officer Carter had reasonable suspicion or probable cause to stop the Defendants' vehicle.

B.  Whether Chanthasouxat's consent to search the Defendants' vehicle was voluntary.

C. Whether Chanthasouxat had an expectation of privacy in his conversation with Xayasane as they waited in the back of the police car.

D.  Whether the district court erred in determining that Officer Carter did not exceed the scope of a permissible traffic stop.

## III.  <u>STANDARDS OF REVIEW</u>

This court reviews a district court's findings of fact for clear error, *United States v. Zapata*, 180 F.3d 1237, 1240 (11th Cir. 1999), viewing all facts in the light most favorable to the party that prevailed in the district court.  *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).  This court reviews the district court's application of law to facts *de novo*.  *Zapata*, 180 F.3d at 1240.  "A district court's ruling on a motion to suppress presents a mixed question of law and fact." *Id.*

## IV.  <u>DISCUSSION</u>

A. <u>Whether the district court erred in finding that Officer Carter had reasonable suspicion or probable cause to stop the Defendants' vehicle.</u>

i. <u>Reasonableness and the Fourth Amendment</u>

9

"The Fourth Amendment protects individuals from unreasonable search and seizure." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir.), *cert. denied*, 534 U.S. 830, 122 S. Ct. 73, 151 L. Ed. 2d 38 (2001); U.S. Const. amend. IV. However, a traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred under *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996).[2] "The touchstone of the Fourth Amendment is reasonableness . . . ." *United States v. Knights,* 534 U.S. 112, 118, 122 S. Ct. 587, 591, 151 L. Ed. 2d 497 (2001). Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. *See Ornelas v. United States,* 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-62, 134 L. Ed. 2d 911 (1996).

ii. The Parties' Contentions

The Defendants contend that Officer Carter did not have reasonable suspicion or probable cause to stop the van because the lack of an inside rear-view

---

[2]The Ninth Circuit held in *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000), that the Supreme Court's statement in *Whren* that probable cause justifies a traffic stop did not change the Court's previous holding in *Terry* that "reasonable suspicion is all the Fourth Amendment requires [for a traffic stop]." *Id.* at 1104-05 (noting that the Ninth Circuit would join the Eighth, Sixth, and Tenth Circuits in so holding).

mirror is not a violation under either municipal or state law. Therefore, they argue, the district court should have suppressed the evidence seized from the van and Chanthasouxat's statements. The Defendants rely on cases from two other circuits, *United States v. Lopez-Soto*, 205 F.3d 1101 (9th Cir. 2000), and *United States v. Lopez-Valdez*, 178 F.3d 282 (5th Cir. 1999), in support of their argument.

The government distinguishes *Lopez-Soto* and *Lopez-Valdez* on the ground that in those cases, the language of the applicable statutes was clear, rendering the officers' beliefs as to the subject traffic violations unreasonable. In contrast, the government argues that, in the present case, the applicable statute is ambiguous, and the applicable traffic laws can reasonably be construed to cover the violation in question. Thus, according to the government, Officer's Carter's interpretation of the law was objectively reasonable. The government relies on the holding of the Seventh Circuit in *United States v. Cashman,* 216 F.3d 582 (7th Cir. 2000), in support of its contention that if Officer Carter's interpretation of the law was reasonable, then his stop of the Defendants did not violate their rights under the Fourth Amendment.

iii. <u>Analysis</u>

The government's argument and its reliance on *Cashman* fail to take into account that, for a Fourth Amendment analysis, the difference between a mistake

of law and a mistake of fact is critical. As discussed *infra,* an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer's mistake of law may not.

a. An Officer's Mistake of Fact and the Fourth Amendment

A traffic stopped based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. *Saucier v. Katz,* 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001). *See also United States v. Gonzalez,* 969 F.2d 999, 1006 (11th Cir. 1992); *United States v. Garcia-Acuna,* 175 F.3d 1143, 1147 (9th Cir. 1999); *United States v. Lang,* 81 F.3d 955, 966 (10th Cir. 1996); *United States v. Shareef,* 100 F.3d 1491, 1503 (10th Cir. 1996); *United States v. Hatley,* 15 F.3d 856, 859 (9th Cir. 1994).

Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers "on the scene." *See Saucier,* 533 U.S. at 205-206, 121 S. Ct. at 2158 (discussing excessive force claims while noting that excessive force and probable cause questions are subject to the same Fourth Amendment analysis). "The principal components of a determination of reasonable suspicion or probable cause will be . . . viewed from the standpoint of

12

an objectively reasonable police officer . . . ." *Ornelas,* 517 U.S. at 696, 116 S. Ct. at 1661-1662. In *Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S. Ct. 2793, 2800, 111 L. Ed. 2d 148 (1990), the Supreme Court noted that "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable."

An officer's mistake of fact may provide the objective basis for reasonable suspicion or probable cause under the Fourth Amendment because of the intensely fact-sensitive nature of reasonable suspicion and probable cause determinations. *See Ornelas,* 517 U.S. at 695-696, 116 S. Ct. at 1661. The Supreme Court has noted that "[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible" because they *"are . . .* fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Id.* The Court has also noted its "long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application." *Ker v. California,* 374 U.S. 23, 33, 83 S. Ct. 1623, 1630, 10 L. Ed. 2d 726 (1963). Thus, an officer's mistaken assessment of facts need not render his actions unreasonable because what is reasonable will be

13

completely dependent on the specific and usually unique circumstances presented by each case. *See Ornelas,* 517 U.S. at 695-696, 116 S. Ct. at 1661-62.

For example, in *Cashman,* on which the government relies, the Seventh Circuit found that an officer had probable cause to stop a car with a seven to ten inch crack in the windshield under a state law that required that no vehicle's windshield be "excessively cracked or damaged." *Cashman*, 216 F.3d at 586 (quoting WIS. ADMIN. CODE § Trans. 305.34(3) (1997) (internal quotations omitted). The Wisconsin Code further specified exactly what constituted an excessive crack or damage, and Cashman argued that the crack in his windshield did not meet that criteria. *Id.* at 586-87. The Seventh Circuit held that even if "[c]areful measurement after the fact . . . reveal[ed] that the crack" was not excessive, the police officer still had probable cause to stop Cashman: "the Fourth Amendment requires only a reasonable assessment of the facts, not a perfectly accurate one." *Id.* at 587. The Seventh Circuit also held that the "propriety of the traffic stop does not depend . . . on whether [the defendant is] actually guilty of committing a traffic offense . . . . The pertinent question instead is whether it was reasonable for [the officer] to *believe* that [a traffic offense had been committed]." *Id.* (citing *United States v. Smith*, 80 F.3d 215, 219 (7th Cir. 1996)). The Seventh Circuit also noted that "so long as the circumstances confronting a police officer

support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver." *Id.* at 586.

b. An Officer's Mistake of Law and the Fourth Amendment

The government's reliance on *Cashman* is misplaced because *Cashman* involved an officer's possible mistake of fact, not a mistake of law. In the case before us, however, the officer's mistake was one of law. Relying on *Lopez-Soto* and *Lopez-Valdez*, the Defendants argue that under the Fourth Amendment, an officer's mistake of law cannot provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop.

In *Lopez-Soto,* the officer stopped the defendant because, based on his police academy training, the officer mistakenly believed that the Baja California vehicle code required that each vehicle's registration sticker be visible from the rear of the vehicle. In fact, the code required that the sticker "be placed on the upper right hand corner of the windshield." *Lopez-Soto,* 205 F.3d at 1105 (citing Ley de Transito y Transportes art. 44 (Baha California, Mex.)) (internal quotations omitted). The Ninth Circuit held that the stop "was not objectively grounded in the governing law" and thus was unconstitutional, even though the officer's "mistaken view of the law [was held] in good faith." *Id.* at 1106.

15

In *Lopez-Valdez,* an officer stopped the defendant for a broken taillight. The plastic cover of the taillight was broken, but the bulb itself was intact. 178 F.3d at 284-85. However, because of a previous case regarding the same statute ten years earlier, the Fifth Circuit noted that "no well-trained Texas police officer could reasonably believe that white light appearing with red light through a cracked red taillight lens constituted a violation of traffic law." *Id.* at 289. Therefore, the traffic stop was not "objectively reasonable." *Id.* at 289 n.6. In addition, the Fifth Circuit held that the good-faith exception to the exclusionary rule should not be extended to cover an officer's mistake of law. *Id.* at 289.

In the present case, Officer Carter testified that at the time he wrote the citation, he believed, based on information from his training officer and the city magistrate and his history of having written over 100 tickets for "improper or no rear-view mirror" that the Birmingham City Code required vehicles to have inside rear-view mirrors. Despite the government's arguments to the contrary, we see no ambiguity on the face of either the Alabama statute or the Birmingham ordinance. The Birmingham law merely requires that a driver be able to "obtain a view of the street to the rear by looking backward from the driver's position" *or* have "a mirror so located as to reflect to the driver a view of the streets for a distance of at least 200 feet of the rear of the vehicle." Birmingham City Code § 10-11-5.

16

Under the plain language of this ordinance, drivers who can look backward from the driver's position to see out a back window would not be required to have *any* rear-view mirror. But even if a rear-view mirror is required because the driver cannot "obtain a view of the street to the rear by looking backward from the driver's position," the ordinance says nothing about requiring that the mirror be on the *inside* of the vehicle.

The Alabama statute requires a rear-view mirror, but specifies only that the mirror be "so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such motor vehicle." Ala. Code § 32-5-214 (2002). Again, there is no requirement that the mirror be *inside* the vehicle. Admittedly, the requirement that the driver be able to see 200 feet to the rear of his vehicle creates a question of fact,[2] but since the statute does not assume that this requirement can only be met by an inside rear-view mirror, there is no reason for

---

[2] The Birmingham ordinance would require a fact determination as to whether the van was loaded or constructed in such a way that the driver could not turn around and see out the back, and if so, whether the van had a mirror which provided the driver a view of the street 200 feet behind the vehicle. The Alabama statute would require a fact determination only on the second question. In the present case, these questions are irrelevant because the Defendants were driving a Mercury Villager, pictures of which demonstrate that the van had rear windows which would allow Defendants to "obtain[] a view of the street to the rear by looking backward from the driver's position." Furthermore, there was no testimony that the van was "loaded so as to prevent [Defendants]" from being able to see out the rear windows of the van. Thus, the van would have complied with the Birmingham ordinance even if it had not had any rear-view mirror. The van would have complied with the Alabama statute because it was equipped with outside rear-view mirrors (assuming that these mirrors would provide the driver a view 200 feet to the rear of the vehicle).

17

Officer Carter to make such an assumption. The magistrate's fee schedule for "improper or no rear-view mirror" also says nothing about requiring an *inside* rear-view mirror.

Even if the statutes were ambiguous, that ambiguity could not help the government's case. This is because the government asks us to use the alleged ambiguity of a statute *against* a defendant. More specifically, the government would have us sweep behavior into the statute which the authors of the statute may have had in mind but failed to put into the plain language of the statute. To do so would violate the fundamental principle that a criminal statute that is so vague that it does not give reasonable notice of what it prohibits violates due process. *See Rogers v. Tennessee,* 532 U.S. 451, 456-457, 121 S. Ct. 1693, 1698, 149 L. Ed. 2d 697 (2001) ("Deprivation of the right to fair warning [of what a criminal statute prohibits] . . . can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face."). Of course, the statutes at issue are not criminal statutes. Nonetheless, we decline to use the vagueness of a statute *against* a defendant.

In *United States v. Miller,* 146 F.3d 274, 278 (5th Cir. 1998), the Fifth Circuit noted that "[i]t should go without saying that penal statutes are to be

18

strictly construed." The traffic stop at issue in *Miller* was based on the defendant's prolonged use of his left turn signal without turning left or moving into the left lane. *Id.* at 276. The officer believed this was an infraction and pulled the defendant over. After obtaining consent for a search, the officer found marijuana in Miller's vehicle. The Fifth Circuit held that, because the defendant's conduct was "not a violation of Texas law, no objective basis for probable cause justified the stop of Miller." *Id.* at 279. Thus, the stop was unconstitutional, and the drug evidence would have to be excluded unless "Miller's consent to the search . . . cured the constitutional taint on the evidence." *Id.* The court explained that

> The rule articulated by the Supreme Court in *Whren* provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions. But the flip side of that leeway is that the legal justification must be objectively grounded.

*Id.*

We agree with the government that taken together, Officer Carter's training, the city magistrate's statement to Officer Carter regarding the law, and

19

his history of having written more than 100 tickets for lack of an inside rear-view mirror make Officer Carter's mistake of law reasonable. The district court credited Officer Carter's testimony that, for the reasons mentioned, Officer Carter believed that the Birmingham Code required inside rear-view mirrors. We do not question that finding. Furthermore, we note that Officer Carter's mistake of law was more justified than the mistakes at issue in *Lopez-Soto, Lopez-Valdez,* and *Miller*. In *Lopez-Soto*, the officer's mistake of law was based only on incorrect police academy training. In *Lopez-Valdez*, the police officer had the benefit of an identical case from ten years earlier. In *Miller*, the officer had no objective reason for his mistake of law. In contrast, Officer Carter had not merely been trained that the failure to have an inside rear-view mirror violated the Birmingham traffic code. In addition, a city magistrate had told him the same thing and, most significantly, he had written more than 100 tickets for this particular "violation."

Nonetheless, the government's argument is misguided because it proposes that we ask the wrong question: *i.e.,* whether Officer Carter's mistake of law was reasonable under the circumstances. We would answer that question in the affirmative. However, the correct question is whether a mistake of law, no matter how reasonable or understandable, can provide the objectively reasonable grounds for reasonable suspicion or probable cause. And to that question we join the Fifth

20

and Ninth Circuits in holding that a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop.

We also agree with the Fifth Circuit, *Lopez-Valdez,* 178 F.3d at 289, and the Ninth Circuit, *Lopez-Soto,* 205 F.3d at 1106, that the good faith exception to the exclusionary rule established by *Leon* should not be extended to excuse a vehicular search based on an officer's mistake of law. The Ninth Circuit explained that

> there is no good-faith exception to the exclusionary rule for
> police who do not act in accordance with governing law.
> To create an exception here would defeat the purpose of the
> exclusionary rule, for it would remove the incentive for
> police to make certain that they properly understand the
> law that they are entrusted to enforce and obey.

*Lopez-Soto,* 205 F.3d at 1106 (internal citation omitted). We also note the fundamental unfairness of holding citizens to "the traditional rule that ignorance of the law is no excuse," *Bryan v. United States*, 524 U.S. 184, 196, 118 S. Ct. 1939, 1947, 141 L. Ed. 2d 197 (1998), while allowing those "entrusted to enforce" the law to be ignorant of it.

Because Officer Carter's mistake of law cannot provide the objective basis

for reasonable suspicion or probable cause, we conclude that the traffic stop at issue violated the Fourth Amendment.

B. Whether Chanthasouxat's consent to search the Defendants' vehicle was voluntary.

As a general rule, the evidence gathered as a result of an unconstitutional stop must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484-85, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963). However, a defendant's consent to a search may cure the constitutional taint on evidence obtained by violating a defendant's Fourth Amendment rights. *Id.* at 486, 83 S. Ct. at 416-17. In this case, to cure the taint on the drug evidence obtained after the illegal traffic stop, the government would have to prove (1) that Chanthasouxat's consent to the search was voluntary, *Santa*, 236 F.3d at 676, and (2) that his consent was obtained "by means sufficiently distinguishable [from the illegal stop] to be purged of the primary taint." *Id.* at 677 (internal quotations omitted). "[T]he second requirement focuses on causation . . . ." *Id.* at 676. We consider three factors in determining whether a voluntary consent was obtained by exploitation of an illegal seizure: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Id.* at 677 (citing *Brown v. Illinois,* 422 U.S.

22

590, 603-04, 95 S. Ct 2254, 2261, 45 L. 2d. 416 (1975)); *United States v. Valdez,* 931 F.2d 1448, 1452 (11th Cir. 1991).

In the present case, there was an extremely close temporal proximity between the illegal stop and Chanthasouxat's consent to the search because the video tape revealed that only three minutes elapsed between the time Officer Carter stopped the van and Chanthasouxat consented to a search. Thus, the temporal proximity prong indicates that Chanthasouxat's consent to search the van was not an independent act of free will. As for the second prong, "intervening circumstances," it is difficult to imagine that significant changes in circumstances could arise in a mere three minutes; but even if intervening circumstances could arise in such a short period of time, none are mentioned in the record. As for the third factor, "the purpose and flagrancy of the initial conduct," we conclude that this prong also weighs toward suppression because we have found that the initial stop violated Defendants' Fourth Amendment rights. Thus, all three factors indicate that there was no break in the causal chain between the illegal traffic stop and Chanthasouxat's consent to search the van; therefore, Chanthasouxat's consent was a product of the illegal stop rather than an independent act of free will, and the drug evidence must be suppressed. Because we hold that Chanthasouxat's consent was a product of the illegal stop, it is unnecessary for us

23

to discuss whether Chanthasouxat's consent was voluntary. *See Santa*, 236 F.3d at 676-77.

C. <u>Whether Chanthasouxat had an expectation of privacy in his</u> <u>conversation with Xayasane as they waited in the back of the police car.</u>

Chanthasouxat contends that his statements to Xayasane, which were recorded as he waited in the back of the patrol car during the search of the van, should be suppressed. If the initial stop had been constitutional, Chanthasouxat's argument would be foreclosed by our decisions in *United States v. Gilley*, 43 F.3d 1440 (11th Cir. 1995) (holding that a defendant does not have an expectation of privacy in recorded statements made to a co-defendant in the back seat of a police car), and *United States v. McKinnon*, 985 F.2d 525, 528 (11th Cir. 1993) (holding that a defendant "did not have a reasonable or justifiable expectation of privacy for conversations he held while seated in the back seat area of a police car"). However, because we hold that the initial stop violated Defendants' rights under the Fourth Amendment, Chanthasouxat's presence in the back of the patrol car and his statements made to Xayasane while in the back of the patrol car are "fruits of the poisonous tree," and, as such, must be suppressed. *See Wong Sun,* 371 U.S. at 484-85, 83 S. Ct. at 415-16.

24

D. Whether the district court erred in determining that Officer Carter did not exceed the scope of a permissible traffic stop.

Because we conclude that the initial traffic stop violated the Fourth Amendment, the violation was not cured by voluntary consent, and that Chanthasouxat's statements made to Xayasane while seated in the patrol car were fruits of the poisonous tree, we hold that the drug evidence and Chanthasouxat's statements must be suppressed. Therefore, we need not reach the issue of whether the traffic stop was reasonably limited in scope and duration as required by *Purcell*.

## V. CONCLUSION

For the foregoing reasons, we hold that the district court erred in denying Defendants' motions to suppress the drug evidence and Chanthasouxat's statements made in the back of the patrol car. Accordingly, we reverse the Defendants' convictions and remand this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.