FILED
United States Court of Appeals
Tenth Circuit

February 1, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

JUDAH PRINCE, f/k/a Rex A. Lutes,

      Defendant-Appellee.

No. 09-3208

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:09-CR-10008-JTM-1)**

James A. Brown, Assistant United States Attorney (Lanny D. Welch, United
States Attorney, with him on the briefs), Topeka, Kansas, for Plaintiff-Appellant.

Timothy J. Henry, Assistant Federal Public Defender, Wichita, Kansas, for
Defendant-Appellee.

Before **TACHA, ANDERSON,** and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendant Judah Prince, indicted by a federal grand jury on drug and

firearms-related charges, moved to suppress evidence seized by the government

during a search of his residence. The district court not only granted Prince's

motion and ordered suppression of all evidence seized from Prince's residence, it also sua sponte ordered suppression of all evidence obtained by the government from the inception of its investigation of Prince. The government now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the district court's suppression order and remand for further proceedings.

I

*The investigation of Prince*

The underlying facts of this case are uncontroverted. In January 2008, Georgia-based agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) "were conducting an investigation into the illegal manufacture and sale of firearms by" an individual named "Raybon Wilson through an online site called 'Gunbroker.com.'" App. at 54. The ATF agents learned "that some AK-47 flats" i.e., pieces of flat metal containing holes and laser perforations, had been shipped by Wilson to Prince, a Kansas resident. Id. "Based solely upon the purchase of the flat[s], the Georgia ATF office made a referral to the Wichita ATF office." Id.

On January 9, 2008, two Wichita-based ATF agents, Wesley Williamson and Greg Heiert, were assigned to investigate Prince's purchase of the AK-47 flats. At approximately 11:00 a.m. that day, Williamson and Heiert, together with Newton (Kansas) Police Detective Bryan Hall, "went to Prince's place of employment, King Construction, to ask him about the AK-4[7] flats." Id. "After

2

visiting briefly, Prince agreed to meet the officers at his residence in Newton, Kansas, over his lunch hour." Id.

When Prince subsequently arrived at his house during the lunch hour, he "explained to the investigators that all the items they wanted to see were in his garage because he had been to a gun show selling firearms and related materials." Id. Prince then "opened the garage door and showed the investigators the items he believed they were interested in seeing." Id. The officers observed several firearms. Although "Prince answered many questions" posed by the officers, he "ultimately refused [their] request to look through his home." Id.

Following this lunch-time encounter, the officers obtained a search warrant for Prince's residence to search for evidence concerning violations of 18 U.S.C. §§ 922(a)(1)(A) and 922(o).[1] The officers executed the warrant, which authorized a search for and seizure of various items including firearms, ammunition, and related evidence, which the officers had reason to believe would be found in Prince's home. During the search, "officers observed in plain view several plants of marijuana and an apparatus for growing [them]." Id. "A second search warrant was then obtained from a Harvey County [Kansas] judge based on those

_____

[1] Section 922(a)(1)(A) makes it unlawful "for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce . . . ." Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun."

3

observations, and those items [of contraband] were then seized." Id. at 54-55.

*Initial criminal proceedings*

On January 10, 2008, a complaint was filed in federal district court charging Prince with one count of possessing with intent to distribute 100 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1), one count of possessing a firearm that was not registered to him, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871, and one count of possessing firearms while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). A federal grand jury subsequently indicted Prince on one count of possessing with intent to distribute 100 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1).

On September 5, 2008, Prince moved to suppress certain items seized during the search of his home on January 9, 2008, arguing that the affidavit submitted by Special Agent Williamson in support of the first search warrant contained deliberate falsehoods and material omissions, and was thus insufficient to establish probable cause. The district court conducted a hearing on Prince's motion to suppress on November 24, 2008. On December 3, 2008, the district court denied Prince's motion, finding "that none of the claimed inconsistencies or inaccurate statements by Agent Williamson were made with any kind of intention to mislead, and that there were no material omissions from the affidavit in support of the search warrant." Id. at 181. The district court also concluded that "there [wa]s certainly enough information in Agent Williamson's affidavit for a neutral

4

and detached magistrate to find that probable cause existed to search . . . Prince's home." Id. at 182.

On January 10, 2009, Prince moved to dismiss the indictment with prejudice due to a violation of the Speedy Trial Act. On January 16, 2009, the district court dismissed the case without prejudice.

*The instant criminal proceedings*

On February 5, 2009, a federal grand jury returned a two-count indictment charging Prince with manufacturing 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 802(15) and (22), and possessing firearms while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). A superseding indictment was subsequently returned against Prince charging him with one count (Count 1) of manufacturing 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 802(15) and (22), twenty-five counts (Counts 2 through 26) of making false statements or representations on federal firearms forms, in violation of 18 U.S.C. § 924(a)(1)(A), and one count (Count 27) of possessing firearms while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).

On June 8, 2009, Prince moved to "incorporate and preserve" suppression issues previously litigated in the initial criminal proceedings against him. Id. at 17. In support of this motion, Prince noted that in the initial criminal proceedings he had moved unsuccessfully to suppress certain evidence, and he "request[ed]

5

[that] the arguments and issues preserved therein be incorporated into the [second] case to avoid duplicating" the prior suppression hearing, "yet permitting counsel to preserve those issues should th[e] case go to trial and, if convicted, be subsequently appealed." Id. at 17-18. The government had no objection to this request.

In that same motion, Prince also sought "to preserve for further review the following issue: whether the Government[] [was correct in its] position that the selling of a 'flat' [wa]s the equivalent of a 'receiver or frame' to qualify as a 'firearm' as that term is defined in 18 U.S.C. § 921(a)(3)(B) . . . ." Id. at 18. Prince argued that "[t]he only allegation of illegality that supported the issuance of the search warrant" for his home "was indirectly tied to an initial investigation in Georgia of Raybon Wilson's selling of . . . 'flats' over the website Gunbroker.com." Id. In turn, Prince argued that "[i]f 'flats' do not qualify as firearms, then selling them would not qualify as illegal conduct," and "[t]he issue would be more a mistake of law, rather than a mistake of fact." Id. Lastly, Prince argued, if there was "a mistake of law, then a Fourth Amendment violation occur[red], and the search" of his home "and all fruits that flow[ed] from it . . . must be suppressed." Id.

The government, in response, argued that the flats were properly classified as "firearms," and that, in any event, several other factors outlined in the affidavit "support[ed] the finding of probable cause . . . ." Id. at 24. Included among those

6

factors, the government asserted, were Prince's admission "to recently selling items at a gun show, and to purchasing firearms for re-sale because prices were going up," and the fact that Prince "did not have a license to sell firearms and did not have a license to manufacture or possess a machinegun." Id. at 25.

On June 25, 2009, the district court held a hearing on Prince's pending motions. At the outset, the district court held that "the rulings that were made in the prior case w[ould] incorporate into this [case], as the parties ha[d] suggested . . . ." Id. at 79. The district court then turned to Prince's "argument regarding the flats." Id. at 84. With respect to that issue, the government presented testimony from Adam Galbraith, a firearms enforcement officer employed by the ATF. Galbraith noted that federal law defines "[a] firearm . . . as a weapon that will expel a projectile by the action of an explosive," and "includes the frame or receiver of such a weapon." Id. at 87. In turn, Galbraith testified that "[t]he frame or receiver is, in essence, the heart of the firearm," and "is most often the component to which all other parts of the firearm are attached," including "the barrel, the trigger and hammer components, [and] the slide in the case of a pistol." Id. Galbraith conceded that the flats at issue "[c]learly" would not expel a projectile by the action of an explosive. Id. at 90. However, he opined that "two large features" of the flats "enable[d] them to be used as the frame or receiver of a firearm." Id. at 91. These features included "the presence of holes that allow[ed] the attachment . . . of a barrel through the use of a trunnion and the

7

installation of a hammer and trigger," and "the presence of laser cuts" that "allow[ed] th[e] flat[s] to be folded by hand without the use of special tools." Id. Regarding this latter feature, Galbraith opined that the laser cuts "would allow" the flat "to be placed in to [sic] a commonly available bench vice, and then bent, either using, literally, bare hands, or by using common tools such as pliers." Id. at 92. Lastly, Galbraith testified that "[a]ny firearm frame or receiver," including the flats at issue, "in order to be shipped from one state to another, need[ed] to be shipped to a licensed dealer or a holder of a federal firearms license in the state in which the purchaser reside[d]," and that it would be a violation of federal law "if the person that received it in the receiving state was not" a federally licensed firearms dealer. Id. at 95.

The following day, June 26, 2009, the district court held a telephonic hearing during which it orally granted Prince's motion to suppress. Although the district court stated that it found Galbraith to be "a terrific witness," id. at 131, it ultimately rejected Galbraith's opinion that the flats at issue constituted "receivers." Id. at 132. In turn, the district court stated: "And as a result of that, and given the fact that that was the basis for obtaining the warrant and the entire search, I am going to suppress everything." Id. at 133.

Later that same day, the district court issued a memorandum and order memorializing its oral ruling. The memorandum and order stated, in pertinent part:

8

The court finds that the metal flat shipped to Prince is not a firearm. The court carefully considered the expert testimony of Agent Adam Galbraith, and reviewed the material submitted by the government concerning ATF opinions. However, the court simply does not believe that a flat piece of metal with laser perforations and holes constitutes a "receiver," i.e., a "firearm." Rather, the flat piece of metal is somewhat akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an airplane until it is properly folded. Until that time, it is a patterned piece of paper. Simply put, this court has no evidentiary or legal basis for holding that a flat piece of metal with laser perforations and some holes constitutes, ultimately, a "firearm." It may become part of a firearm at some point, but not until further work has been accomplished to allow it to secure the stock, chamber, barrel and other parts. Until that time, it is not even a true component of a firearm, only a potential component of a firearm. The statute, as written, does not extend that far. Because this court finds that the flats are not "firearms," selling flats is not illegal conduct. Thus, the investigation as it relates to defendant was a mistake of law and a violation of the Fourth Amendment; all the evidence seized from the inception of the investigation must be suppressed. See, e.g., United States v. Orduna-Martinez, 561 F.3d 1134, 1137 (10th Cir. 2009) (noting that a mistake of law usually cannot pass Fourth Amendment muster); United States v. Chanthasouxat, 342 F.3d 1271 (11th Cir. 2003) (suppressing evidence found that was fruit of the poisonous tree, due to an initial stop based on a mistake of law). Further, the good faith exception to the exclusionary rule is inapplicable when a search is based on an officer's mistake of law. United States v. Chanthasouxat, 342 F.3d 1271, 1279-80 (11th Cir. 2003). As such, all the evidence in this case must be suppressed because it all flows from the initial investigation that originated based on the mistake of law.

Id. at 57-58. In sum, the district court's memorandum and order not only granted Prince's motion to suppress evidence seized during the search of his home, it also sua sponte suppressed all of the evidence obtained by the ATF agents between the inception of the investigation and the search of Prince's home, including the

9

observations made by the agents at Prince's home and the statements made by Prince to the agents.

II

The government now appeals the district court's memorandum and order granting Prince's motion to suppress. In considering that ruling, we review the district court's factual findings for clear error, and its legal conclusions de novo. United States v. Carbajal-Iriarte, 586 F.3d 795, 799 (10th Cir. 2009).

*a) Tainting of the investigation in general*

The government contends "the district court erred as a matter of law in concluding that the" investigation as a whole was "tainted by the agents' investigation into the sale of the flats." Aplt. Br. at 18. More specifically, the government challenges as erroneous the district court's conclusion "that 'the investigation as it relates to [Prince] was a mistake of law and a violation of the Fourth Amendment . . . .'" Id. (quoting App. at 58). In support of its position, the government notes that the investigation "included two consensual meetings with [Prince]," "neither of [which] implicated the Fourth Amendment . . . ." Id. at 19. In sum, the government argues that "[a]n officer's mistake of law carries no legal consequence if it furnishes the basis for a consensual encounter, as opposed to a detention or arrest." Id. We agree.[2]

---

[2] We reject Prince's assertion that we are precluded from reviewing these arguments on appeal. Although Prince argued below that the government's

(continued...)

10

It is uncontroverted that the ATF's investigation into Prince's activities was initially prompted by Prince's receipt of flats and the ATF's belief that the flats constituted "firearms" under federal law. As noted, the district court, in addressing Prince's motion to suppress, rejected the ATF's view and concluded that the flats did not constitute "firearms" for purposes of federal law. In turn, the district court held that the officers who investigated Prince's activities made a "mistake of law" in concluding otherwise, and it concluded that the entire investigation of Prince was "tainted" by this "mistake of law."

In reaching its conclusion that the officers' mistake of law "tainted" the investigation and resulted in a Fourth Amendment violation, the district court cited two cases, one from this circuit and one from the Eleventh Circuit: United States v. Orduna-Martinez, 561 F.3d 1134 (10th Cir. 2009), and United States v. Chanthasouxat, 342 F.3d 1271 (11th Cir. 2003). Neither case, however, is helpful here. In Orduna-Martinez, the defendant, who was stopped by a Kansas state

---

[2](...continued)
purported mistake of law tainted the search of his home, the district court concluded, sua sponte, that the government's purported mistake of law tainted the entire investigation, which would include evidence obtained by the officers when Prince voluntarily met them at his garage and discussed with them its contents and his recent buying and selling of firearms and related materials. Thus, this appeal represents the government's first opportunity to address that issue. Further, we note that the underlying facts were amply developed and are uncontroverted, see United States v. Mendez, 118 F.3d 1426, 1431 n.2 (10th Cir. 1997), thus presenting us with a narrow issue of law, the resolution of which we conclude is certain. United States v. Jarvis, 499 F.3d 1196, 1202 (10th Cir. 2007).

trooper while driving eastbound on I-70, argued that the trooper "lacked reasonable suspicion to stop him because Kansas law does not require registration decals to be legible."  561 F.3d at 1137.  In addressing this issue, we outlined general Fourth Amendment principles and noted, in pertinent part, that "an officer's mistake of law usually cannot justify a traffic stop under the Fourth Amendment."  561 F.3d at 1137 (citing United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005)).  Ultimately, however, we agreed with the trooper that Kansas state law required registration decals to be legible, and in turn concluded that the trooper had reasonable suspicion to stop the defendant's vehicle.  Id. at 1138-39.

In Chanthasouxat, an Eleventh Circuit case, the defendant argued in similar fashion that the Birmingham (Alabama) police officer who stopped his vehicle "did not have reasonable suspicion or probable cause to [do so] because the lack of an inside rear-view mirror [wa]s not a violation under either municipal or state law."  342 F.3d at 1275.  In addressing this issue, the Eleventh Circuit held that "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer's mistake of law may not."  Id. at 1276.  Further, the Eleventh Circuit held "that the good faith exception to the exclusionary rule established by United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed. 2d 677 (1998) should not be extended to excuse a vehicular search based on an officer's mistake of law."

12

Id. at 1280.

As noted by the government, these two cases "are inapt . . . because they are context-bound to instances where an officer seizes a defendant based on a mistake of law . . . ." Aplt. Br. at 20 (emphasis in original). Here, in contrast, the mistake of law at issue did not result in any such seizure. Rather, the mistake of law simply led to two consensual encounters between the law enforcement officers and Prince (i.e., the initial interview at Prince's place of employment, and the subsequent meeting at Prince's residence, during which Prince voluntarily spoke to the officers and allowed the officers access to his garage), and the latter of those consensual encounters provided the officers with additional information that, as discussed in more detail below, independently provided probable cause for the initial search warrant.

It is well established that consensual encounters between police officers and individuals implicate no Fourth Amendment interests. Florida v. Bostick, 501 U.S. 429, 434 (1991). Thus, the Supreme Court has "stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual" and "request consent to search" property belonging to the individual that is otherwise protected by the Fourth Amendment, "as long as the police do not convey a message that compliance with their requests is required." Id. at 434-35. The necessary implication of this is that a consensual encounter motivated by a mistake of law on the part of the

13

investigating officer likewise does not implicate any Fourth Amendment concerns.

Thus, contrary to the conclusion reached by the district court, we conclude that the investigating officers' purported mistake of law neither independently resulted in a Fourth Amendment violation nor otherwise "tainted" the entire investigation.[3]

*b) Probable cause to search Prince's residence*

The government next argues that, contrary to the conclusion ultimately reached by the district court, "[t]he [investigating] agents' probable cause to search [Prince's] residence did not depend on their legal conclusion . . . that a flat was a firearm." Aplt. Br. at 16. According to the government, "[a]lthough the agents went to [Prince's] residence because of the flats, while they were there they observed physical evidence and heard statements from [Prince] that provided probable cause to believe he was 'manufacturing, or dealing in firearms' in violation of 18 U.S.C. § 922(a)(1)(A), or 'possess[ed] a machinegun' in violation of 18 U.S.C. § 922(o), as stated in the [a]ffidavit" submitted in support of the initial search warrant. Id. We once again agree.

An affidavit submitted in support of a search warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause

---

[3] Because the government has not raised the issue on appeal, we need not decide whether the flats at issue are "receivers" and therefore "firearms" under 18 U.S.C. § 921(a)(3)(B).

. . . ." Illinois v. Gates, 462 U.S. 213, 239 (1983). "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Grubbs, 547 U.S. 90, 95 (2006) (quoting Gates, 462 U.S. at 238). Where, as here, it is alleged that improper material tainted an affidavit, "we may disregard [that] material . . . and ask whether sufficient facts remain to establish probable cause." United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc).

Following the second of the two consensual encounters between the investigating officers and Prince, ATF agent Williamson prepared an affidavit in support of a search warrant for Prince's residence. The affidavit outlined in detail the ATF's investigation of Prince, including the two consensual encounters with Prince. With respect to the second consensual encounter, the affidavit stated:

11. PRINCE agreed to meet the agents at his residence, #8 Rolling Hills Court, Newton, Kansas 67114, at his lunch time, which he said was 12 noon on 1-9-2008.

12. At approximately 1210 hours, PRINCE arrived at his residence. The investigators were awaiting his arrival in a vehicle parked in the street in front of his residence. PRINCE drove up next to the investigators and explained that all of the items the investigators wanted to look at had been placed in the garage of the residence. PRINCE further relayed that these items had been put there over the weekend because PRINCE had been at the gun show selling items.

* * *

14. PRINCE backed his truck into the driveway opening the garage door by use of a remote opener. PRINCE identified several boxes and ammo cans on the floor of the garage as the items that the

15

investigators were interested in looking at. PRINCE assisted the agents in lifting the boxes and cans onto the rear of his truck to facilitate the agents looking through the items.

15. As SA Williamson was going through the items SA Williamson observed two of the AK-47 flats that are believed to have been sold by RAYBON WILSON to PRINCE in violation of federal law. PRINCE stated that he had purchased the AK-47 flats from gunbroker.com

16. SA Williamson further observed numerous bags that were identified as full auto parts and at least seven (7) or more "parts kits." "Parts kits" are commonly known as firearms (including machineguns) that have been de-milled or cut up in accordance with federal law and sold as "parts kits." In SA Williamson's experience, individuals will take several "parts kits" using a combination of the parts from the "parts kits" and new parts and assembled [sic] them into new firearms including machineguns. PRINCE also had a receiver for an UZI type firearm along with several bags that were labeled full auto parts that appeared to be for the UZI.

17. PRINCE stated that he had been purchasing firearms, "parts kits," ammunition and magazines for re-sale since the price keeps going up on all of the items. PRINCE stated that he had sold a bunch of ammunition at the last gun show. PRINCE then recanted stating that he does not sell his firearms but coats them with a rust protectant and then puts them away.

18. SA Williamson observed that the boxes PRINCE had received some of the "parts kits" in were addressed to his name with a Wichita address. PRINCE claimed that he received the packages at a rented box in Wichita since he was not home often and didn't want the boxes just left on his porch.

19. SA Williamson asked PRINCE where PRINCE's other firearms were. PRINCE stated that he doesn't keep any firearms at his residence because he loves his grandchild and began describing the child. SA Williamson asked again where the other firearms were located. PRINCE became evasive and stated that he keeps everything else in a storage unit in another county with a friend's stuff and did not want to involve the other party. SA Williamson

16

then asked PRINCE to take SA Williamson through the interior of the residence to satisfy SA Williamson that there were no other items that PRINCE was not supposed to have. PRINCE stated that he did enough and was not going to do anymore. PRINCE then stated that he couldn't take SA Williamson through the residence due to a dog being inside. PRINCE stated that he had done enough and that if he had spoken to a lawyer a lawyer would have told PRINCE not to allow the agents to see what he had already shown them.

App. at 151-53. Williamson's affidavit also contained the following relevant

information:

24. A computer check of PRINCE was conducted which revealed that PRINCE was also known as Rex A. Lutes, white male, 4-5-1959. The criminal history revealed that PRINCE AKA LUTES had been convicted in 1989 in the Pratt County District court of misdemeanor assault, felony terroristic threats and possession of hallucinogenic (2 or more convictions) and was given a sentence of 60 to 120 months. These charges were later expunged.

25. A further computer check revealed that PRINCE is not a Federal Firearms Licensee nor does he have any firearms registered to him in the National Firearms Registration and Transfer Record.

26. In order for PRINCE to obtain the AK-47 flats and the Full-Auto AK-47 jig PRINCE would need access to the internet via a computer in order to obtain the items from gunbroker.com or to have an account on gunbroker.com.

27. Based on SA Williamson's experience and training it is common for those people who possess firearms and ammunition in violation of Federal Firearms [Laws], to keep the firearms, ammunition and evidence of their possession, on their person, in their vehicle, or in their residence. It is also common for people who possess firearms and ammunition to retain those items for long periods of time.

Id. at 153. Based upon these allegations, Williamson's affidavit sought

permission to search Prince's residence, as well as "the outbuildings and vehicles

17

located on the curtilage of" the residence, "[f]or any of the fruits, instrumentalities and/or evidence of one or more violations of Title 18 United States Code Section 922(a)(1)(A) [making it unlawful for any person except a licensed manufacturer or dealer to engage in the business of manufacturing or dealing in firearms], and/or Title 18 United States Code Section 922(o) [making it unlawful for any person to transfer or possess a machinegun]." Id. at 157.

To resolve the question of whether the investigating officers had probable cause to search Prince's residence, we need not decide whether the flats delivered to Prince's home constituted "firearms" under federal law. We conclude that the totality of the evidence recounted in Williamson's affidavit, aside from Williamson's legal characterization of the flats, substantially supported the conclusion that there was a "fair probability that contraband or evidence of a crime" would be found in Prince's residence. Gates, 462 U.S. at 238. Of particular note were the items Williamson observed in Prince's garage, including "full auto parts" and "parts kits", a receiver for an Uzi-type firearm, bags labeled full auto parts that appeared to be for an Uzi-type firearm, Prince's own statements that he purchased firearms for resale and had recently sold ammunition at a gun show, and Williamson's subsequent investigative efforts that revealed that Prince did not have a federal firearms license and had not officially registered any firearms in his own name. This evidence, considered together, amply supported Williamson's suspicion that Prince was manufacturing firearms,

18

particularly machineguns, and reselling those firearms at gun shows, and that further evidence of this crime could be found inside Prince's residence. Thus, we conclude Williamson's purported "mistake of law" in characterizing the flats alone as "firearms" did not fatally "taint" Williamson's affidavit or the ensuing search warrant.

The district court's memorandum and order granting defendant Prince's motion to suppress is REVERSED and the case REMANDED for further proceedings.