[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10944
Non-Argument Calendar
_____

D.C. Docket No. 8:11-cr-00401-JDW-AEP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RIGOBERTO BAUTISTA-VILLANUEVA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 25, 2013)

Before CARNES, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

Rigoberto Bautista-Villanueva ("Bautista") appeals his convictions for conspiracy to transport 100 or more aliens within the United States, either knowing or in reckless disregard that the aliens were unlawfully in the United States, 8

U.S.C. § 1324(a)(1)(A)(v)(I), and transporting illegal aliens for the purpose of commercial advantage and private financial gain, id. § 1324(a)(1)(A)(ii), (B)(i). He argues that the district court erred in denying his motion to suppress because he was unlawfully stopped and detained without reasonable suspicion.  After thorough review, we affirm.

We review the denial of a motion to suppress as a mixed question of law and fact: rulings of law are reviewed de novo and findings of fact are reviewed for clear error, in the light most favorable to the government.  United States v. Spoerke, 568 F.3d 1236, 1244 (11th Cir. 2009).

The facts are these.  United States Border Patrol ("BP") agents Gregory McConnell and John Blades observed Bautista and three Hispanic male passengers driving down Interstate 75 ("I-75") in Florida.  Bautista's sedan had a Texas license plate, and this section of I-75 was known for use in smuggling illegal aliens from the southwestern states into Florida's agricultural and construction centers. McConnell began following the sedan in his marked BP vehicle and noticed that: (1) the three passengers were silently staring straight ahead; (2) the car's interior appeared to contain no trash or luggage; (3) the driver was well-groomed and well-dressed while the passengers were ungroomed and in t-shirts; and (4) even after McConnell circled the sedan in his BP vehicle and peered into the windows, the passengers continued to silently stare straight ahead.  Based on McConnell's

2

experience in alien trafficking, the appearance of the sedan's occupants was consistent with alien smuggling. McConnell also ran a registration check through a radio dispatcher, who told him that the sedan was registered to PV Holding Company ("PV") out of Houston, Texas. Agent McConnell found this fact "extremely significant" because he knew that Houston was a hub for warehousing illegal aliens until smuggling arrangements could be made.

As he continued to follow the sedan, McConnell called the dispatcher and asked her to run a further records check on PV. She informed McConnell that 18 other cars belonging to PV previously had been implicated in alien and drug smuggling. In particular, BP agents had recently seized a vehicle owned by PV near Houston, and found five illegal aliens hiding inside. At the time, this was all the information Agent McConnell knew about PV, and he surmised that it might have been a small car dealership owned by an alien-smuggling operation.

The sedan abruptly exited the highway, after apparently having seen the BP vehicle, and McConnell followed it into a gas station and parked behind it. McConnell, armed and in uniform, approached the driver's side and questioned Bautista, who (1) provided a valid Florida driver's license and Honduran passport showing that he was legally in the United States as a permanent resident; (2) said that he and his passengers were traveling from Houston, where he'd been working, to a party in Orlando, Florida; (3) replied that his passengers were from Mexico

3

and Honduras, were legally in the United States, but had left their documentation in Texas; and (4) gave McConnell permission to look in his trunk and the bags therein. In the trunk, there were only two small bags, which Bautista claimed. In one bag's mesh pockets, McConnell found a receipt from an Orlando auto parts dealer dated four days before. When asked why he had this receipt if he was just now driving from Texas to Orlando, Bautista replied that he had driven to Orlando four days ago to pick up a truck part, and then drove straight back to Houston.

During this conversation, Blades arrived, parked, and got out of his vehicle. He asked one of the passengers, who was trying to exit the sedan, to return inside. A third BP vehicle soon arrived. When McConnell questioned Bautista's passengers, they all essentially admitted they were in the United States illegally. At that point, the agents arrested Bautista and his passengers, and brought them and the sedan to the Jacksonville BP Station for processing. McConnell later testified that he then initiated paperwork to seize the sedan since it had been used to transport illegal aliens, but several days later, he learned that PV, the sedan's registered owner, was a leasing division of the nationwide Avis/Budget rental car company ("Avis"). He said that if he had recognized the sedan as a rental vehicle at the time of the arrests, he would not have prepared the paperwork for the seizure because the BP does not seize rental cars, but instead, returns them to their owners.

4

The district court denied Bautista's motion to suppress physical and testimonial evidence obtained as a result of the BP agent's stop of the sedan. The district court found that there was no seizure because Bautista's encounter with the BP agents was consensual but, even if the encounter progressed into a seizure, the agents had reasonable suspicion to detain and question Bautista. Bautista's trial resulted in a guilty verdict on all three counts. This timely appeal follows.

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. Const. Amend. IV. While brief seizures and investigatory detentions implicate the Fourth Amendment, law enforcement officers may, "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior" without probable cause to make an arrest. Terry v. Ohio, 392 U.S. 1, 22 (1968). Officers may seize a suspect for a brief, investigatory Terry stop where (1) the officers have reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop is "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004) (quotations and alteration omitted). Although reasonable suspicion requires less than probable cause, police must still "articulate facts which provide some minimal, objective justification for the stop." United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

5

The principal components of a determination of reasonable suspicion or probable cause will be viewed from the standpoint of an objectively reasonable police officer.  United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003).  The Supreme Court has noted that "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable."  Id. (quotation omitted).  Officers are expected to use their experience and specialized training to draw inferences from the cumulative information available to them, inferences that may evade untrained observers.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  In deciding whether an officer had reasonable suspicion to make a stop, courts look at the totality of the circumstances.  United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009).  Subjective considerations, like a suspect's nervousness in the presence of an officer, may be relevant factors.  Id. at 1274.  Officers' objective observations and "consideration of the modes or patterns of operation of certain kinds of lawbreakers" are also relevant.  United States v. Cortez, 449 U.S. 411, 418 (1981).  Any obvious attempt to evade law enforcement officers can support reasonable suspicion.  United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975).  Furthermore, we've held that reasonable suspicion existed where a driver erratically accelerated and decelerated, and, despite the agent's "obvious and repeated attempts to attract their attention,"

6

the passengers remained nervous and stared straight ahead.  Bautista-Silva, 567 F.3d at 1274.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  We accept a fact finder's credibility determination unless it relies on testimony that is "contrary to the laws of nature" or "so inconsistent or improbable on its face that no reasonable factfinder could accept it."  Id. (quotations omitted).

Here, even accepting that Agent McConnell's encounter with Bautista progressed into a seizure, the agents had reasonable suspicion to seize and briefly detain him based on the totality of the circumstances.  For starters, before McConnell approached the sedan, he received information from a dispatcher that the sedan was registered to PV, out of Houston, which was a known hub for alien smuggling, and that PV had owned multiple cars implicated in the smuggling of drugs and illegal aliens.  Although it turned out that PV was a leasing division of the Avis rental car company, the information that the agent relied upon about PV -- that some PV vehicles had been involved in alien and drug smuggling -- was surely reasonable under the circumstances.  See Chanthasouxat, 342 F.3d at 1276.

The agents' reasonable suspicion to seize and briefly detain Bautista is further supported by the fact that, prior to the detention, Agent McConnell had observed that the sedan had a Texas license plate and was traveling along a section of the highway known for alien-smuggling, that the occupants were disparately dressed and exhibited suspicious conduct, and that there was a notable lack of luggage in the car for a trip by four people between Texas and Florida. Based on these observations, Agent McConnell, an officer trained specifically in the practices of alien smuggling, drew the inference that the passengers' appearance was consistent with alien smuggling. The agents also saw Bautista abruptly cut across traffic to exit the interstate after being followed by McConnell's marked BP vehicle -- behavior that could reasonably be considered evasive. In short, the BP agents observed sufficient objective indicators to justify reasonable suspicion for a seizure and brief detention of Bautista and his passengers, and the district court properly denied Bautista's motion to suppress the evidence obtained pursuant to this lawful seizure.

**AFFIRMED.**

8