# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2011AP2907-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Antonio D. Brown, |
| | Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
346 Wis. 2d 98, 827 N.W.2d 903
(Ct. App. 2013 – Published)
PDC No: 2013 WI App 17

| | |
|---|---|
| OPINION FILED: | July 16, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 15, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Rebecca F. Dallet |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | PROSSER, J., dissents. (Opinion filed.) |
| | ROGGENSACK, ZIEGLER, JJ., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Aaron O'Neil*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.


For the defendant-appellant, there were briefs by *Hannah B. Schieber*, assistant state public defender, and oral argument by *Hannah B. Schieber*.

An amicus curiae brief was filed by *Ellen Henak* and *Henak Law Office, S.C.*, Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2011AP2907-CR
(L.C. No.   2010CF3318)

STATE OF WISCONSIN                    :        IN SUPREME COURT

**State of Wisconsin,**

          **Plaintiff-Respondent-Petitioner,**

    **v.**

**Antonio D. Brown,**

          **Defendant-Appellant.**

**FILED**

**JUL 16, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   ANN WALSH BRADLEY, J.  The State of Wisconsin seeks review of a published decision of the court of appeals[1] that reversed the circuit court's denial of Antonio Brown's motion to vacate his conviction and plea and to suppress all evidence seized during a stop of his vehicle.  The court of appeals determined that the circuit court erred because there was no probable cause or reasonable suspicion to stop Brown's vehicle.

_____

[1] State v. Brown, 2013 WI App 17, 346 Wis. 2d 98, 827 N.W.2d 903 (reversing order of the circuit court for Milwaukee County, Rebecca F. Dallet, J.).

Accordingly, it concluded that the evidence resulting from the search should have been suppressed.

¶2 The State contends that the officers' observation of an unlit light bulb in Brown's tail lamp justified a stop because the law requires all light bulbs in a tail lamp to be lit. It asserts that this requirement is found in Wis. Stat. § 347.13(1) (2009-10),[2] which prohibits the operation of a vehicle at night unless its tail lamps are in "good working order." Because the officers observed a violation of the law, the State maintains that they had probable cause to stop the vehicle. Even if the unlit bulb was not part of the tail lamp, the State contends that it still created reasonable suspicion to stop the vehicle and the results of the search should not be suppressed.

¶3 Contrary to the State, we do not interpret Wis. Stat. § 347.13(1) as requiring every single light bulb in a tail lamp to be lit. The plain language of the statute requires that a tail lamp emit a red light visible from 500 feet behind the vehicle during hours of darkness. This interpretation is further supported by related statutes requiring that the lamps be in proper working condition. Wis. Stat. § 347.06(3).

¶4 Because the only basis for the stop of Brown's vehicle was the unlit bulb, we conclude that there was not probable cause or reasonable suspicion to stop the vehicle. Where the stop of the vehicle was unlawful, so too was its search, and the

_____

[2] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

results of that search must be suppressed. Accordingly, we affirm the court of appeals.

I

¶5 It is uncontested that Brown was a passenger in a Buick Electra that was stopped by police officers. During the stop, the officers searched the vehicle and discovered a gun. Brown was charged with possession of a firearm by a felon, in violation of Wis. Stat. § 941.29(2). He subsequently filed a motion to suppress the gun, asserting that the officers lacked reasonable suspicion or probable cause to stop the vehicle.

¶6 At the motion hearing the State presented the testimony of Officer Wawrzonek and Officer Feely. Although some details varied, the officers' testimony regarding the stop of Brown's vehicle was largely consistent.

¶7 According to the officers, they were on a routine patrol when they spotted a 1977 Buick Electra with a "defective tail light." Officer Wawrzonek explained that there was a "wide band" with three light panels on the back of the vehicle and one of the panels was out. Officer Feely stated that it was the middle light on the driver's side that was out. Based on the Buick's "defective" tail lamp, Officer Feely activated the flashing red and blue lights on their patrol car and conducted a traffic stop. After stopping the vehicle and removing its passengers, Officer Feely searched the vehicle and discovered a firearm under the front passenger-side seat.

¶8 Brown presented the testimony of Willie Lipsey who stated that on the night of the stop he attended a barbeque with

3

Brown. When they left, Lipsey drove Brown's car because Brown was intoxicated. Lipsey testified that he stopped at a gas station and observed that the tail lamps were functioning properly when he pumped gas into the car. He was in a position to see this as the gas tank of the Buick is behind the rear license plate. After leaving the gas station, Lipsey headed home. The stop occurred as he was parking.

¶9 Several photographs of the back of Brown's vehicle were admitted into evidence. One photograph is a close-up view of the rear-passenger side of the vehicle with the outside panel encasing the tail lamp removed. Four light bulbs are visible: a cluster of three bulbs on the left-hand side and a fourth bulb toward the center of the vehicle next to its license plate. In explaining the photo, Lipsey testified that the first and third lights were tail lights, the second light was a brake light, and the separate light was a reverse light. According to Lipsey, only the two tail lights are lit when the car is driving down the street.

¶10 The circuit court denied the suppression motion. It determined that Lipsey's testimony that the tail lights were working was not credible. In contrast, it found the officers' testimony to be credible and therefore determined that there was probable cause for the stop. It further determined that the search was justified by the need to protect the officers' safety.

¶11 Following the ruling, Brown pled guilty to the charge.[3] Subsequently, the court sentenced Brown to five years imprisonment with three years initial confinement and two years extended supervision.

¶12 Brown submitted a motion for postconviction relief seeking an order vacating his conviction and guilty plea and suppressing all evidence seized during the stop of the Buick. Citing Wis. Stat. § 347.13(1), he asserted that there was no basis for the stop because under the law only two tail lamps must be in good working order, not all of four of them. Accordingly, he contended that the stop of the Buick was unconstitutional and evidence found during its search must be suppressed.[4]

¶13 The circuit court denied the postconviction motion. It determined that the officers had a reasonable belief that one of the vehicle's tail lamps was defective. Even if the officers

_____

[3] Although a guilty plea generally waives all nonjurisdictional defects and defenses, there is an exception which permits appellate review of orders denying motions to suppress evidence. Wis. Stat. § 971.31(10); Cnty. of Racine v. Smith, 122 Wis. 2d 431, 434-35, 362 N.W.2d 439 (Ct. App. 1984).

[4] In the alternative, Brown argued to the circuit court that he was denied effective assistance of counsel because his trial attorney failed to bring Wis. Stat. § 347.13(1) to the court's attention. The court concluded that this argument was unconvincing because it did not agree with Brown's interpretation of Wis. Stat. §347.13(1). Brown's motion also requested an order amending the judgment of conviction to include 209 days of sentence credit for the time he spent in jail between the date of his arrest and the date of his sentencing. The court determined that Brown was entitled to 195 days, not 209 days of sentence credit.

5

were wrong, the court stated, that did not affect their reasonable belief at the time of the stop.

¶14 On appeal, Brown again argued that the evidence from the search of the vehicle should have been suppressed because there was no probable cause or reasonable suspicion for the stop.

¶15 Although a stop can be based on either probable cause or reasonable suspicion, the court of appeals determined that the issue in this case was whether the unlit bulb created probable cause. State v. Brown, 2013 WI App 17, ¶¶14-15, 346 Wis. 2d 98, 827 N.W.2d 903. It noted the officers' testimony that they stopped the vehicle because of the unlit bulb, stating "[t]hey did not act upon a suspicion that warranted further investigation, but on [their] observation of a violation being committed in [their] presence." Id. at ¶15 (quoting State v. Longcore, 226 Wis. 2d 1, 8-9, 594 N.W.2d 412 (Ct. App. 1999)). Because the officers were not acting on a suspicion, but on what they believed was a violation of law being committed in their presence, the court concluded that probable cause was the appropriate focus. Id.

¶16 The court of appeals agreed with Brown. Id. at ¶21. It reasoned that under Wis. Stat. § 347.13(1) a vehicle's tail lamps do not need to be fully lit or in perfect condition in order to be in "good working order." Id. Noting that a lawful stop cannot be predicated on a mistake of law, the court determined that the officers' mistaken belief that all the tail lights on a vehicle need to be lit could not serve as probable

6

cause for a stop. Id. (citing Longcore, 226 Wis. 2d at 9). Accordingly, it reversed the circuit court.[5]

II

¶17 In this case we are asked to consider whether Brown's vehicle was lawfully stopped.[6] "Whether there is probable cause or reasonable suspicion to stop a vehicle is a question of constitutional fact." State v. Popke, 2009 WI 37, ¶10, 317 Wis. 2d 118, 765 N.W.2d 569. As such, it is a mixed question of fact and law, requiring a two-step standard of review. State v. Post, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634. This court reviews the circuit court's findings of fact under the clearly erroneous standard, and reviews independently the application of those facts to constitutional principles. Id.

¶18 Here, the relevant facts are undisputed. The parties agree that the officers stopped Brown's vehicle because one of

---

[5] Because it reversed on the merits, the court of appeals did not address Brown's alternative argument that his trial counsel was ineffective. Brown, 346 Wis. 2d 98, ¶21 n.6. Brown also appealed the issue of his sentence credit. The court also determined that it did not need to address Brown's sentencing credit issue because it reversed his conviction. It noted that the State had conceded that had Brown's conviction stood, he would have been entitled to the sentence credit he sought. Id. at ¶22. For the same reason as the court of appeals, we also do not address the issues of ineffective assistance of counsel or Brown's sentence credit.

[6] When accepting the petition for review, we asked the parties to address the propriety of the search in light of Arizona v. Gant, 556 U.S. 332 (2009). Both parties affirmatively stated that Gant does not apply and that the issue in this case is whether the stop itself violated Brown's rights, not the subsequent search. Accordingly, we limit our analysis to the reasonableness of the stop of Brown's vehicle.

the three lights on the rear driver's side of the car was not lit.  Thus, our inquiry focuses on whether under the facts there were sufficient grounds for a traffic stop.  This inquiry calls upon us to interpret the relevant statute establishing the requirements for vehicle tail lamps, Wis. Stat. § 347.13(1).  Statutory interpretation is a question of law that we review independently of the decisions rendered by the circuit court and the court of appeals.  State v. Ziegler, 2012 WI 73, ¶37, 342 Wis. 2d 256, 816 N.W.2d 238.

III

¶19  We begin our analysis by examining the constitutional principles underlying traffic stops.  The Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect citizens from unreasonable searches and seizures.[7]  Traffic stops are considered seizures and thus must be reasonable to pass constitutional muster.

---

[7] The Fourth Amendment of the United States Constitution states "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  Likewise, Article I, Section 11 of the Wisconsin Constitution, provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause . . . ."

This court generally interprets the protections against unreasonable searches and seizures afforded by the state and federal constitutions coextensively.  State v. Post, 2007 WI 60, ¶10 n.2, 301 Wis. 2d 1, 733 N.W.2d 634.  "However, the state provisions may provide greater protections."  Id. (citing State v. Eason, 2001 WI 98, ¶63, n.31, 245 Wis. 2d 206, 629 N.W.2d 625).

Popke, 317 Wis. 2d 118, ¶11; Whren v. United States, 517 U.S. 806, 809-10 (1996). If the seizure is unreasonable and therefore unconstitutional, then evidence obtained as a result is generally inadmissible. State v. Harris, 206 Wis. 2d 243, 263, 557 N.W.2d 245 (1996). A good faith exception to this rule applies in limited circumstances such as where the police have relied in good faith on either a warrant issued by a detached and neutral magistrate or on well-settled law that was subsequently overturned. State v. Dearborn, 2010 WI 84, ¶44, 327 Wis. 2d 252, 786 N.W.2d 97; State v. Eason, 2001 WI 98, ¶3, 245 Wis. 2d 206, 629 N.W.2d 625.

¶20 The burden is on the State to prove that a stop meets the constitutional reasonableness requirement. Post, 301 Wis. 2d 1, ¶12; Harris, 206 Wis. 2d at 263. A traffic stop can be based on probable cause or reasonable suspicion. State v. Gaulrapp, 207 Wis. 2d 600, 605, 558 N.W.2d 696 (Ct. App. 1996) (citing Whren, 517 U.S. at 809-10; Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). "[P]robable cause exists when the officer has 'reasonable grounds to believe that the person is committing or has committed a crime.'" Popke, 317 Wis. 2d 118, ¶14 (quoting Johnson v. State, 75 Wis. 2d 344, 348, 249 N.W.2d 593 (1977)). There is reasonable suspicion justifying a stop if "the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." Post, 301 Wis. 2d 1, ¶13.

9

¶21 In this case, the officers stopped Brown's vehicle because one of the bulbs on the back of the vehicle was unlit. The State asserts that the unlit bulb created probable cause to stop the vehicle because it violated the requirement in Wis. Stat. § 347.13(1) that tail lamps be in "good working order." It further contends that even if the officers were wrong and the unlit bulb was not part of the tail lamp, the unlit bulb still created reasonable suspicion that Wis. Stat. § 347.13(1) was being violated. Brown disagrees with both contentions, arguing that Wis. Stat. § 347.13(1) does not require all bulbs in a tail lamp to be lit and thus the officers had neither probable cause nor reasonable suspicion to stop his vehicle.

¶22 Both parties agree that if the officers' interpretation of the law were incorrect that the stop would be unconstitutional because a lawful stop cannot be predicated upon a mistake of law. Longcore, 226 Wis. 2d at 9. At oral argument, the State explicitly stated that "we are not challenging Longcore."[8] In its supplemental briefing the State

---

[8] At oral argument counsel for the State engaged in the following exchange:

Justice Ziegler: Why couldn't [the stop] be based upon the officer's reasonable belief that the tail light was out?

Attorney for the State: It could be based on the- if the officer could reasonably believe that that bulb was part of the tail lamp, and the law requires that all the bulbs be lit in the tail lamp, if that's correct, then the stop would be valid on the basis of-

Chief Justice Abrahamson: Even if he's wrong.

10

maintained that "the existence of probable cause or reasonable suspicion in the context of a traffic stop depends on the correct interpretation of the statute prohibiting the conduct."[9]

¶23 A substantial majority of the federal circuit courts have also held that a lawful stop cannot be predicated upon a mistake of law.[10] United States v. Williams, 740 F.3d 308, 312 (4th Cir. 2014) ("Nor do we suggest that a police officer's mistake of law can support probable cause to conduct a stop when the underlying conduct was not, in fact, illegal."); United

---

Attorney for the State: Even if he's wrong about the facts. But if he's wrong about the law, then we are conceding that the stop was invalid.

[9] After oral argument this court asked the parties for supplemental briefing. Specifically, the court asked the parties to brief:

1) whether the officer had reasonable suspicion to stop Brown's vehicle because the officer believed that Wis. Stat. § 347.13(1) was violated when not all the tail light bulbs on Brown's vehicle were working.

2) whether an officer's good faith mistake of law on which the officer makes a traffic stop, requires reviewing courts to conclude that the stop was not lawful.

State v. Brown, No. 2011AP2907, unpublished order (Feb. 26, 2014).

[10] Justice Roggensack's dissent advocates a minority position. Only three circuit courts have adopted an approach which would permit a stop based on an error of law: the D.C. Circuit, the Third Circuit, and the Eighth Circuit. See United States v. Southerland, 486 F.3d 1355, 1359 (D.C. Cir. 2007); United States v. Delfin-Colina, 464 F.3d 392, 399 (3d Cir. 2006); United States v. Bueno, 443 F.3d 1017, 1024 (8th Cir. 2006).

States v. McDonald, 453 F.3d 958, 962 (7th Cir. 2006) (determining stop was unreasonable where "even if [the driver] acted exactly as [the officer] believed, his actions were not a violation of any Illinois state traffic law."); United States v. Coplin, 463 F.3d 96, 101 (1st Cir. 2006) ("Stops premised on a mistake of law, even a reasonable, good-faith mistake, are generally held to be unconstitutional."); United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005) ("[F]ailure to understand the law by the very person charged with enforcing it is _not_ objectively reasonable."); United States v. Chanthasouxat, 342 F.3d 1271, 1279 (11th Cir. 2003) ("[A] mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop."); United States v. Twilley, 222 F.3d 1092, 1096 (9th Cir. 2000) ("[I]n this circuit, a belief based on a misunderstanding of the law cannot constitute the reasonable suspicion required for a constitutional traffic stop."); United States v. Miller, 146 F.3d 274, 279 (5th Cir. 1998) ("[G]iven that having a turn signal on is not a violation of Texas law, no objective basis for probable cause justified the stop of Miller").

¶24 As the Seventh Circuit has explained, "[a]n officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law." McDonald, 453 F.3d at 961. The grounds for a traffic stop must be objectively reasonable and "[a] stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not

12

objectively reasonable." Id. at 962. Admitting evidence into the record on such a basis "would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." Id. (quoting United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000)); see also Wayne A. Logan, Police Mistakes of Law, 61 Emory L.J. 69, 106 (2011) ("there has been no mistaking that the specter of [the exclusionary rule's] application has prompted police departments to significantly fortify and improve their training efforts relative to Fourth Amendment expectations.").

¶25 Further, the rule that an officer's mistake of law is not sufficient grounds for a stop is consistent with holdings from a substantial majority of the state courts that have addressed the issue. State v. Babcock, 992 N.E.2d 1215, 1220 (Ohio Ct. App. 2013) ("[W]e hold that the exclusionary rule operates to bar the admission of evidence obtained as a result of a traffic stop based on conduct that a police officer mistakenly believes is a violation of the law."); Martin v. Kan. Dep't of Revenue, 176 P.3d 938, 948 (Kan. 2008) ("[A] police officer must be held to a more demanding standard of legal knowledge than any citizen who may be subject to the officer's exercise of authority. . . . [C]onsequently [we] hold that an officer's mistake of law alone can render a traffic stop violative of the Fourth Amendment. . . ."); State v. Tiffin, 121 P.3d 9, 12 (Or. Ct. App. 2005) ("[T]he facts, as the officer perceives them, must actually constitute an infraction in order

13

for the officer's belief that an infraction occurred to be objectively reasonable."). See also State v. Cantsee, 321 P.3d 888, 891 (Nev. 2014); State v. Dunbar, 728 S.E.2d 539, 545 (W. Va. 2012); State v. Louwrens, 792 N.W.2d 649, 654 (Iowa 2010); McDonald v. State, 947 A.2d 1073, 1079-80 (Del. 2008); State v. Williams, 185 S.W.3d 311, 319 (Tenn. 2006); State v. Lacasella, 60 P.3d 975, 981 (Mont. 2002); State v. Lussier, 757 A.2d 1017, 1029 (Vt. 2000); Commonwealth v. Rachau, 670 A.2d 731, 735 (Pa. Commw. Ct. 1996); Commonwealth v. Bernard, 3 N.E.3d 1113, 1115 n.2 (Mass. App. Ct. 2014); Gilmore v. State, 42 A.3d 123, 135 (Md. Ct. Spec. App. 2012); Robinson v. State, 377 S.W.3d 712, 722 (Tex. Crim. App. 2012); J.D.I. v. State, 77 So. 3d 610, 617 (Ala. Crim. App. 2011); Gunn v. State, 956 N.E.2d 136, 139 (Ind. Ct. App. 2011); People v. Cole, 874 N.E.2d 81, 88 (Ill. App. Ct. 2007); State v. Kilmer, 741 N.W.2d 607, 611 (Minn. Ct. App. 2007); People v. Ramirez, 44 Cal. Rptr. 3d 813, 816 (Cal. App. 2006); State v. Puzio, 878 A.2d 857, 860 (NJ App. Div. 2005); Gordon v. State, 901 So. 2d 399, 405 (Fla. Dist. Ct. App. 2005); Byer v. Jackson, 661 N.Y.S.2d 336, 338 (N.Y. App. Div. 1997).[11]

---

[11] We acknowledge that a minority of the state courts that have addressed the issue have taken a contrary position. See, e.g., State v. Heien, 737 S.E.2d 351 (N.C. 2012); Moore v. State, 986 So. 2d 928, 935 (Miss. 2008); Travis v. State, 959 S.W.2d 32, 34 (Ark. 1998); McConnell v. State, 374 S.E.2d 111, 113 (Ga. Ct. App. 1988); DeChene v. Smallwood, 311 S.E.2d 749, 751 (Va. 1984).

¶26 Having examined the application of constitutional principles underlying traffic stops, we turn to address the interpretation of Wis. Stat. § 347.13(1) in order to apply those principles in this case. Statutory interpretation begins with the language of the statute. State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. The language in a statute "is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id. Further, a statute's language is interpreted in the context in which it is used, "in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. at ¶46.

¶27 Wisconsin Stat. § 347.13(1) requires a vehicle to have at least one tail lamp which emits a red light visible to another vehicle traveling 500 feet behind it and prohibits operation of a vehicle at night when its tail lamps are not "in good working order." Wis. Stat. § 347.13(1). The statute provides:

> No person shall operate a motor vehicle . . . upon a highway during hours of darkness unless such motor vehicle . . . is equipped with at least one tail lamp mounted on the rear which, when lighted during hours of darkness, emits a red light plainly visible from a distance of 500 feet to the rear. No tail lamp shall have any type of decorative covering that restricts the amount of light emitted when the tail lamp is in use. No vehicle originally equipped at the time of manufacture and sale with 2 tail lamps shall be

15

> operated upon a highway during hours of darkness unless both such lamps are in good working order.

Wis. Stat. § 347.13(1) (emphasis supplied). The term "tail lamp" is defined as "a device to designate the rear of a vehicle by a warning light."[12] Wis. Stat. § 340.01(66). At issue in this case is what constitutes a tail lamp in "good working order."

¶28 The phrase "good working order" is not defined in the statute, thus we accord the phrase its common, ordinary and accepted meaning. "In determining the ordinary meaning of undefined words, '[w]e may consult a dictionary to aid in statutory construction." Xcel Energy Servs. v. Labor & Indus. Review Comm'n, 2013 WI 64, ¶30, 349 Wis. 2d 234, 833 N.W.2d 665 (quoting Cnty. of Dane v. Labor & Indus. Review Comm'n, 2009 WI 9, ¶23, 315 Wis. 2d 293, 759 N.W.2d 571).

¶29 Dictionary definitions of "good," "working," and "working order" suggest that the term "good working order" means suitable or functioning for the intended use.[13] Thus, the

---

[12] Because Wis. Stat. § 340.01(66) defines "tail lamp" as "a device," it is the entire tail lamp, and not each individual light bulb in the tail lamp, that must function as indicated by Wis. Stat. § 347.13(1).

[13] For definitions of "good" see The American Heritage Dictionary of the English Language 780 (3d ed. 1992) ("[s]erving the desired purpose or end, suitable"); The Random House Unabridged Dictionary 822 (2d ed. 1993) ("satisfactory in quality, quantity, or degree"); and Webster's Third New International Dictionary 978 (1986) ("adapted to the end designed or proposed: satisfactory in performance").

ordinary meaning of "good working order" focuses on whether an object is functioning so as to fulfill its intended purpose.

¶30 Further, construing "good working order" in the context of Wis. Stat. § 347.13(1) to mean functioning for the intended purpose is consistent with how we have construed "good working order" in the past.

¶31 In State v. Trailer Service, Inc., 61 Wis. 2d 400, 404, 212 N.W.2d 683 (1973), the court looked to function when determining whether a certified scale for weighing a vehicle was in "good working order." The case involved a dispute over whether a truck had been properly weighed before its driver was given a citation for overload. Id. at 402. The court examined two statutes: Wis. Stat. § 348.19(1)(a), permitting an officer to require a truck to be weighed on the nearest usable scale, and Wis. Stat. § 348.15(5), requiring trucks to be weighed on scales that are in "good working order." Id. at 404-05. It noted that "'[u]sable' also means 'in good working order,' i.e.,

---

For definitions of "working" see The American Heritage Dictionary of the English Language 2057 (3d ed. 1992) ("[o]perating or functioning as required," "[s]ufficient to allow action," and "[a]dequate for practical use"); The Random House Unabridged Dictionary 2189 (2d ed. 1993) ("operating; producing effects, results, etc.," and "adequate for usual or customary needs"); and Webster's Third New International Dictionary 2635 (1986) ("adequate to permit work to be done").

For definitions of "working order" see The Random House Unabridged Dictionary 2189 (2d ed. 1993) ("[T]he condition of a mechanism when it is functioning properly."); and Webster's Third New International Dictionary 2635 (1986) ("[A] condition of a machine in which it functions according to its nature and purpose.").

17

in such operating or mechanical condition that it correctly performs the function or utility or the purpose of a scale." Id. at 405. Accordingly, the court determined that the scale's use was permissible because it was shown to make true and accurate measurements. Id.

¶32 Other jurisdictions have also focused on function when determining whether tail lamps are in compliance with a statutory requirement that they be in good or proper working order. See Kroft v. State, 992 N.E.2d 818, 822 (Ind. Ct. App. 2013) (determining that a tail lamp was still in good working order despite a dime-sized hole because there was no evidence the hole affected the visibility of the light to another vehicle); Vicknair v. State, 751 S.W.2d 180, 189-90 (Tex. Crim. App. 1988) (taillight in proper condition despite crack in a taillight because it still emitted a red light visible within the requisite distance).[14] We likewise conclude the focus should be on the function of a tail lamp in determining whether it is in "good working order" under Wis. Stat. § 347.13(1).

¶33 The statutory definition of "tail lamp" provides that its intended purpose is to "designate the rear of a vehicle as a warning light." Wis. Stat. § 340.01(66). The language of Wis. Stat. § 347.13(1) clarifies that a tail lamp does so by emitting

---

[14] Contrary to Justice Roggensack's dissent's assertion, we do not cite to Kroft and Vicknair in support of a conclusion that "the officers acted unreasonably." Justice Roggensack's dissent, ¶112. Rather, the cases are cited for the premise that courts look to function to determine whether there is a violation of a statute.

during hours of darkness "a red light plainly visible from a distance of 500 feet to the rear." Accordingly, a tail lamp is functioning for its intended use and thus in good working order when during hours of darkness it emits a red warning light that is visible to another vehicle traveling 500 feet behind it.

¶34 We do not agree with the State that when read in the context of surrounding statutes Wis. Stat. § 347.13(1) requires all light bulbs in a tail lamp to be lit. The State points to Wis. Stat. § 347.06(3) and Wis. Admin. Code § Trans. 305.16(2) which require tail lamps to be kept in "proper working condition." However, "proper" is not a synonym for "perfect." Rather it is more akin to "good" or "suitable."[15] Thus, the statutes requiring tail lamps to be in proper working condition are more in line with requiring a tail lamp to function for its intended purpose than with requiring all light bulbs in a tail lamp to function perfectly.

¶35 Construing Wis. Stat. § 347.13(1) as requiring every single light bulb on the back of a vehicle to be in perfect condition would lead to absurd and unreasonable results. Not only is such an interpretation inconsistent with the plain language of the statute, but it is also not practical

---

[15] "Proper" is defined as "[c]haracterized by appropriateness or suitability." The American Heritage Dictionary of the English Language 1452 (3d ed. 1992); see also Random House Unabridged Dictionary 1550 (2d ed. 1993) (defining "proper" as "adapted or appropriate to the purpose or circumstances; fit; suitable"); Webster's Third New International Dictionary 1817 (1986) ("adequate to the purpose").

19

considering the variety of tail lamp designs today. Brown points to tail lamps that are composed of multiple light bulbs creating intricate designs. He cites as an example the tail lamp of an Audi, composed of thirty tiny light bulbs, which is pictured in his brief. We agree with Brown that there is nothing to suggest that a single unlit bulb out of several in a tail lamp would necessarily impair the tail lamp's function.

¶36 Wisconsin Stat. § 347.13(1) requires that vehicles with two tail lamps not be operated during hours of darkness "unless both such lamps are in good working order." It would be unreasonable to require the public to maintain every light bulb in a tail lamp in perfect condition when that is more than is required by the statute. The legislature determined that visibility from 500 feet is sufficient to protect public safety and we defer to its policy decisions.

¶37 Contrary to the State's assertions, the standard we adopt is not unworkable and does not fail to give guidance to police officers. This interpretation requires officers to determine if they can see a red light emitted from the back of a vehicle from a distance of 500 feet. Officers routinely have to gauge distances to determine whether motorists have violated traffic laws. See, e.g., Wis. Stat. § 346.33(1)(e) (requires officers to determine whether a driver making a U-turn on a curve or crest can be seen by another driver approaching from 500 feet); § 346.51(1)(b) (requires officers to determine if a standing vehicle can be seen by operators of other vehicles from a distance of 500 feet); § 346.14 (requires officers to

20

determine whether there are 500 feet between vehicles). We are confident that they can apply that ability to determine whether Wis. Stat. § 347.13(1) has been violated as well.

¶38 In this case, the only basis that the State presented for the stop of Brown's vehicle was the unlit bulb in his tail lamp. However, there was no evidence that his tail lamp was not visible from 500 feet to the rear of the car. The officers testified that only one of the bulbs on the back of Brown's vehicle was unlit. Because having one unlit bulb on the back of a vehicle does not on its own violate the statutory requirements for tail lamps, the State has failed to show that the officers had probable cause to believe that a traffic violation had occurred.

¶39 We likewise reject the State's alternative argument that it had reasonable suspicion for the traffic stop. The State asserts that the officers could have reasonably believed that the unlit light bulb was part of the tail lamp. In this case, such an argument is inextricably intertwined with the interpretation of the underlying traffic violation. It fails because even assuming the officers made a mistake of fact regarding whether the unlit light bulb was part of the tail lamp, they would still have to rely on a mistake of law to have reasonable suspicion.

¶40 Like probable cause, reasonable suspicion cannot be based on a mistake of law. Rabin v. Flynn, 725 F.3d 628, 633 (7th Cir. 2013) ("[A] police officer's suspicion of wrongdoing that is premised on a mistake of law cannot justify a Terry

21

stop."); <u>United States v. Tyler</u>, 512 F.3d 405, 411 (7th Cir. 2008) ("[A] mistake of law (as opposed to a mistake of fact) cannot justify an investigative detention."); <u>Chanthasouxat</u>, 342 F.3d at 1279 ("[A] mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop.").

¶41 Because one unlit bulb in a tail lamp does not establish a violation of Wis. Stat. § 347.13(1), the unlit light bulb on Brown's vehicle was an insufficient basis to reasonably suspect that Brown had committed, was committing, or was about to commit a crime. Given that there was no lawful basis asserted as grounds for stopping Brown's vehicle, the evidence the officers found in the vehicle pursuant to that stop is "the fruit" of an illegal seizure. <u>Harris</u>, 206 Wis. 2d at 263. Accordingly, the evidence resulting from the search should be suppressed.

IV

¶42 In sum, we do not interpret Wis. Stat. § 347.13(1) as requiring every single light bulb in a tail lamp to be lit. The plain language of the statute requires that a tail lamp emit a red light visible from 500 feet behind the vehicle during hours of darkness. This interpretation is further supported by related statutes requiring that the lamps be in proper working condition.

¶43 Because the only basis for the stop of Brown's vehicle was the unlit bulb we conclude that there was not probable cause or reasonable suspicion to stop the vehicle. Where the stop of the vehicle was unlawful, so too was its search, and the results

22

of that search must be suppressed. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶44 DAVID T. PROSSER, J. *(dissenting).* The issue presented in this case is whether two Milwaukee police officers had probable cause to stop a vehicle when they perceived what they believed was an unlit light bulb in the tail lamp of the vehicle. There is dispute whether there was or was not an unlit light bulb in the tail lamp of the vehicle. The majority concludes that it makes no difference because "we do not interpret Wis. Stat. § 347.13(1) as requiring every single light bulb in a tail lamp to be lit." Majority op., ¶3. Thus, the majority concludes that the officers made an unconstitutional mistake of law when they acted on the belief that a tail lamp with an unlit bulb was not in "proper working condition at all times" and not "in good working order."

¶45 In my view, the conclusion that partially unlit tail lamps comply with Wis. Stat. § 347.13(1) if they are visible from 500 feet away creates a vague, unworkable standard for law enforcement. Consequently, I respectfully dissent.

I

¶46 On July 3, 2010, two Milwaukee police officers, William Feely and Michael Wawrzonek, were on patrol duty near 2900 West Capitol Drive in the City of Milwaukee. It was approximately 9:30 p.m. Officer Feely was driving a marked squad car. Officer Wawrzonek was in the passenger seat. The officers spotted a 1977 Buick Electra turn south on North 28th Street. Both officers observed what they perceived as a defective tail lamp. When the squad car was approximately three

1

car lengths behind the Electra, it activated its red and blue emergency lights to make a stop of the Electra. At the same time, the vehicle slowed down and pulled over to the curb to stop.

¶47 Following the stop, the officers seized a pistol belonging to the defendant, Antonio D. Brown, who was riding as a passenger in his own vehicle because he was intoxicated. Brown was a convicted felon on parole. He subsequently moved to suppress evidence of the weapon on grounds that police "seizure" of his vehicle was unlawful.

¶48 At the suppression hearing on January 13, 2011, the two officers described the stop. Officer Wawrzonek testified:

Q. Is there anything specific about that vehicle that caught your attention?

A. Yeah, defective tail light.

. . . .

Q. Do you remember what tail light it was that was defective on that unit?

A. It was the driver side tail lamp. There is a wide band and there is actually three light panels on that wide band and one of those panels was out.

. . . .

Q. Now, when you said that there was a defective tail light . . . are you referring to the reflective red lights or the white back-up lights?

A. One of the red lights. He was going——he was going forward so there was no reverse going on at this point so I wouldn't see a white light. It was one of the red lights.

. . . .

Q. So two of the panels were working properly?

2

A.    That's my recollection.

¶49  When  Officer  Feely  testified,  he  identified  the specific light that appeared to be defective:

> Q.  And  do  you  recall  what  the  basis  for  the  stop was, Officer?
>
> A.    Defective tail lamp.
>
> Q.  And  when  you  say  that,  did  you  remember specifically which tail light was out?
>
> A.    Believe it was the driver side middle one.
>
> Q.    Would that have been a red or white light if you recall?
>
> A.    Red.

¶50  At  a  continuation  of  the  suppression  hearing  on January 21, 2011, the driver of the Electra testified that there were no defects in the tail lamps.  He also testified that the vehicle "has red lights on both sides, and a white light is the reverse light, and the middle light is a brake light."

¶51  The driver, Willie Lipsey (Lipsey), said that when the vehicle  was  operating  with  its  lights  on,  there  were  only two red  lights  showing  in  the  tail  lamps  on  each  side  of  the  rear license plate.  He said a red brake light situated between the other red lights in the tail lamp[1] did not illuminate until the driver applied the brakes.

¶52  This description of the operation of the rear lights does  not  explain  why  the  officers  noticed  a  difference  in  the two tail lamp panels——with only the left panel appearing to have

---

[1] "A stop lamp may be incorporated with a tail lamp."  Wis. Stat. § 347.14.  From the testimony, it seems as though the stop lamp was incorporated with the tail lamp in the Electra.

3

a gap between the lights. This description also fails to explain why the officers did not state that both panels were working perfectly when the driver applied the brakes before stopping at the curb. It may have been because the left brake light was not working when the vehicle turned the corner and when it came to a stop. It is also possible that one of the light bulbs in the tail lamp, other than the brake light, was out.

¶53 There appear to be only three possible scenarios: (1) one of the light bulbs in the left tail lamp was not working; (2) the officers thought that one of the light bulbs in the left tail lamp was not working;[2] or (3) the officers were not telling the truth about what they saw. Although the facts remain in dispute, the circuit court found that the officers were credible when they testified that they saw a defective tail lamp and that Lipsey was not credible when he testified that he remembered that all the rear lights were functioning properly.

II

¶54 Wisconsin has an elaborate motor vehicle code,[3] including detailed provisions for motor vehicle lighting equipment. See Wis. Stat. §§ 347.06-347.30.

¶55 Chapter 347 begins with a section that indicates that "Words and phrases defined in s. 340.01 are used in the same sense in this chapter unless a different definition is specifically provided." Wis. Stat. § 347.01.

---

[2] This possibility would have been a mistake of fact.

[3] See Wis. Stat. chs. 340-51.

4

¶56 Section 340.01 includes definitions for numerous lamps such as "Clearance lamps,"[4] "Direction signal lamp,"[5] "Headlamp,"[6] "Identification lamps,"[7] "Multiple beam headlamp,"[8] "Stop lamp,"[9] and "Tail lamp."[10] Chapter 347 contains both general and specific provisions governing these various types of lighting equipment.

¶57 For example, Wis. Stat. § 347.06 reads in part:

> (1) [N]o person may operate a vehicle upon a highway during hours of darkness unless all headlamps, tail lamps and clearance lamps with which such vehicle is required to be equipped are lighted.

---

[4] "'Clearance lamps' means lamps on the left and right sides of the front and rear of a vehicle which show to the front and rear to mark the extreme sides of the vehicle." Wis. Stat. § 340.01(7).

[5] "'Direction signal lamp' means a lighting device used to indicate the intention of the operator of a vehicle to change direction." Wis. Stat. § 340.01(13).

[6] "'Headlamp' means a major lighting device used to provide general illumination ahead of a vehicle." Wis. Stat. § 340.01(21).

[7] "'Identification lamps' means lamps grouped in a horizontal row and mounted on the permanent structure of the vehicle at or near the vertical center line." Wis. Stat. § 340.01(23m).

[8] "'Multiple beam headlamp' means a headlamp designed to permit the operator of the vehicle to use any one of 2 or more distributions of light on the roadway." Wis. Stat. § 340.01(36).

[9] "'Stop lamp' means a device giving a steady warning light to the rear of a vehicle to indicate the intention of the operator of the vehicle to diminish speed or stop." Wis. Stat. § 340.01(63).

[10] "'Tail lamp' means a device to designate the rear of a vehicle by a warning light." Wis. Stat. § 340.01(66).

. . . .

(3) The operator of a vehicle shall keep all lamps and reflectors with which such vehicle is required to be equipped reasonably clean and in proper working condition at all times.

¶58 Wisconsin Stat. § 347.06 is relevant to this case because it prohibits operation of a motor vehicle during hours of darkness unless "all . . . tail lamps . . . are lighted." Wis. Stat. § 347.06(1). Moreover, the operator of a motor vehicle "shall keep all lamps . . . in proper working condition at all times." Wis. Stat. § 347.06(3).

¶59 Wisconsin Stat. § 347.13 is entitled "Tail lamps and registration plate lamps." The section reads in part:

(1) No person shall operate a motor vehicle, mobile home or trailer or semitrailer upon a highway during hours of darkness unless such motor vehicle, mobile home or trailer or semitrailer is equipped with at least one tail lamp mounted on the rear which, when lighted during hours of darkness, emits a red light plainly visible from a distance of 500 feet to the rear. No tail lamp shall have any type of decorative covering that restricts the amount of light emitted when the tail lamp is in use. No vehicle originally equipped at the time of manufacture and sale with 2 tail lamps shall be operated upon a highway during hours of darkness unless both such lamps are in good working order. This subsection does not apply to any type of decorative covering originally equipped on the vehicle at the time of manufacture and sale.

. . . .

(4) Tail lamps and registration plate lamps shall be so wired as to be lighted whenever the headlamps or auxiliary driving lamps are lighted.

Wis. Stat. § 347.13.

¶60 The first sentence of § 347.13(1) serves two purposes. It prohibits a person from operating a motor vehicle during

6

hours of darkness unless the vehicle is equipped with at least one tail lamp. It also establishes equipment standards for motor vehicle tail lamps.

¶61 Most vehicle operators seeking to comply with motor vehicle equipment laws are dependent upon automobile manufacturers and parts suppliers for the equipment on their vehicles. These operators expect that the tail lights they purchase will meet the requirements of the law. All four states bordering Wisconsin have statutes like Wis. Stat. § 347.13(1) that require 500 feet of visibility from rear lamps, implying that 500 feet is a common standard.[11]

---

[11] Every motor vehicle, trailer, or semi-trailer shall also exhibit at least 2 lighted lamps, commonly known as tail lamps, which shall be mounted on the left rear and right rear of the vehicle so as to throw a red light visible for at least 500 feet in the reverse direction . . . .

625 Ill. Comp. Stat. Ann. 5/12-201(b) (West 2014).

Every motor vehicle and every vehicle which is being drawn at the end of a train of vehicles shall be equipped with a lighted rear lamp or lamps, exhibiting a red light plainly visible from a distance of five hundred feet to the rear. All lamps and lighting equipment originally manufactured on a motor vehicle shall be kept in working condition or shall be replaced with equivalent equipment.

Iowa Code Ann. § 321.387 (West 2014).

A motor vehicle, trailer, semitrailer, pole trailer, or vehicle which is being drawn in a train of vehicles shall be equipped with at least 1 rear lamp mounted on the rear, which, when lighted as required by this act, shall emit a red light plainly visible from a distance of 500 feet to the rear.

Mich. Comp. Laws Ann. § 257.686(1) (West 2014).

7

¶62 The majority opinion appears to conclude that if a tail lamp can be seen from 500 feet, it cannot violate the motor vehicle equipment statutes. Majority op., ¶3.

¶63 The next sentence in Wis. Stat. § 347.13(1), which bears on functionality, shows that such a conclusion is incorrect. The second sentence reads: "No tail lamp shall have any type of decorative covering that restricts the amount of light emitted when the tail lamp is in use." Wis. Stat. § 347.13(1) (emphasis added). This sentence demonstrates that there is a concern that each tail light be lit and unobscured. The sentence does not say that a decorative covering may not restrict the amount of light emitted so as to reduce visibility unless it can be seen from 500 feet. The sentence permits no restriction of light.

¶64 The third sentence of Wis. Stat. § 347.13(1) requires that there be no flaw in the tail lamps: "No vehicle originally equipped at the time of manufacture and sale with 2 tail lamps shall be operated upon a highway during hours of darkness unless both such lamps are in good working order." Id. (emphasis added). This sentence requires both tail lamps to be operating in good working order. When this sentence is combined with Wis. Stat. § 347.06(3), an operator is required to keep all tail

---

"Every motor vehicle and every vehicle that is being drawn at the end of a train of vehicles must be equipped with at least one taillamp, exhibiting a red light plainly visible from a distance of 500 feet to the rear." Minn. Stat. Ann. § 169.50.1(a) (West 2014).

8

lamps in proper working condition at all times; that is, in good working order at all times.

¶65 Wisconsin Stat. § 347.14, relating to "stop lamps," reads in part as follows:

> (1) No person shall operate a motor vehicle . . . upon a highway unless such motor vehicle . . . is equipped with at least one stop lamp mounted on the rear and meeting the specifications set forth in this section. . . . A stop lamp may be incorporated with a tail lamp. No vehicle originally equipped at the time of manufacture and sale with 2 stop lamps shall be operated upon a highway unless <u>both such lamps are in good working order.</u>
>
> (2) A stop lamp shall be so constructed as to be actuated upon application of the service or foot brake . . . and shall emit a red or amber light plainly visible and understandable from all distances up to 300 feet to the rear during normal sunlight when viewed from the driver's seat of the vehicle following.

Wis. Stat. § 347.14 (emphasis added).

¶66 Like the previous section, Wis. Stat. § 347.14 requires a particular type of lighting equipment to be "in good working order." Inasmuch as a 1977 Buick Electra has only one rear brake light on each side of the vehicle, a brake light that is defective is 100 percent defective and cannot be——under any reasonable definition——in "proper working condition" or "in good working order."

¶67 The Wisconsin Department of Transportation (DOT) has developed administrative rules to flesh out its lighting equipment statutes. <u>See</u> Wis. Admin. Code § TRANS 305.

¶68 Among these rules are the following:

Trans 305.01 Purpose and Scope.

9

(1) The purpose of this chapter is to prescribe <u>minimum equipment requirements</u> for vehicles and standards for the equipment used on vehicles.

. . . .

Trans 305.02 Applicability.

. . . .

(7) Nothing in this chapter is intended to modify the provisions of ch. 347, Stats., and all vehicles to which this chapter applies shall also comply with the requirements of ch. 347, Stats.

. . . .

Trans 305.03 Enforcement.

No person may operate or allow to be operated on Wisconsin highways any vehicle subject to this chapter that is not in conformity with the applicable requirements of this chapter.

. . . .

Trans 305.15 Stop Lamps.

(1) Every automobile originally manufactured commencing with the 1950 models . . . shall be equipped with at least 2 stop lamps. All other motor vehicles shall be equipped with at least one stop lamp.

(2) The stop lamps of every vehicle shall be <u>maintained in proper working condition</u> and in conformity with this section and s. 347.14, Stats.

. . . .

Trans 305.16 Tail Lamps.

(1) Every automobile originally manufactured commencing with the 1950 models . . . shall be equipped with at least 2 tail lamps. All other motor vehicles shall be equipped with at least one tail lamp.

(2) The tail lamps of every motor vehicle shall be <u>maintained in proper working condition</u> and in

conformity with this section and s. 347.13 (1) and (2), Stats.

(3) All wiring and connections shall be maintained in good condition.

. . . .

(5) The tail lamps shall be so wired as to be lighted whenever the parking lamp or headlamps are lighted.

Wis. Admin. Code §§ TRANS 305.01 (emphasis added), 305.02, 305.03, 305.15 (emphasis added), 305.16 (emphasis added).

¶69 The rules repeat the phrase "in proper working condition" from Wis. Stat. § 347.06(3), even in Wis. Admin. Code. § TRANS 305.15 and § TRANS 305.16, which implement Wis. Stat. §§ 347.14 and 347.13 respectively. Those statutes use the phrase "in good working order." This suggests that the DOT sees these phrases as interchangeable.

¶70 As the majority notes, we may turn to a dictionary to construe undefined words according to their ordinary meanings. Majority op., ¶28. However, the majority's definition of "good working order" is incomplete because it defines "good working order" and "working order" to mean essentially the same thing. Using dictionary definitions, the majority defines "good working order" as "suitable or functioning for the intended use." Id., ¶29 (footnote omitted).

¶71 According to Webster's Third New International Dictionary 2635 (1986), "Working order" means "a condition of a machine in which it functions according to its nature and purpose . . . ." This definition is substantially similar to the majority's definition of "good working order." Thus, the

11

majority's definition renders "good" mere surplusage. In my view, "good working order" must mean something more than "working order."[12]

¶72 As the majority notes, one definition of "good" is "adapted to the end designed or proposed: satisfactory in performance." Majority op., ¶29 n.13. However, there is more to the definition. The cited definition goes on to define "good" as "free from flaws or defects" or "not impaired." Webster's Third New International Dictionary 978 (1986). The definition of "good" that includes "free from flaws or defects" is more helpful than the majority's definition because it better fits within the framework of statutory analysis and the aversion to surplusage. It also gives law enforcement a clear standard to apply when confronted with broken tail lights.

¶73 Because "proper working condition" and "good working order" appear to be interchangeable terms, it is hard to imagine that a tail lamp or a stop lamp that has defective lights can be described as being "in proper working condition" and the condition to which the lamp should be kept "at all times." Wis. Stat. § 347.06(3).

---

[12] Two online definitions of "working order" are different from the majority's minimalist definition. One dictionary suggests "in working order" means "working correctly, without any problems." MacMillan Dictionary, http://www.macmillandictionary.com/us/dictionary/american/working-order (last visited July 3, 2014). Another dictionary suggests that "(in) working order" means "working properly and not broken" or "be in good/perfect/full etc working order." Longman Dictionary of Contemporary English, http://www.ldoceonline.com/dictionary/working_1 (last visited July 3, 2014).

III

¶74 This case is about much more than the felony conviction of Antonio Brown. The majority opinion significantly dilutes the meaning of "proper working condition" and "good working order" in the lighting equipment statutes. This is likely to affect the enforcement of these statutes.

¶75 Wisconsin Stat. § 347.30 provides:

> (1) Any person violating s. 347.06 or 347.13 (2), (3) or (4) may be required to forfeit not less than $10 nor more than $20 for the first offense and not less than $25 nor more than $50 for the 2nd or subsequent conviction within a year.

> (2) Any person violating ss. 347.03, 347.07 to 347.12, 347.13(1) or 347.14 to 347.29 may be required to forfeit not less than $10 nor more than $200.

¶76 The majority concludes that Wis. Stat. § 347.13(1) does not require "every single light bulb in a tail lamp to be lit." Majority op., ¶3. But it does not say what is required for a violation of this statute. The answer cannot turn on whether the tail lamp can be seen from 500 feet because that is not the correct statutory standard and would pose an impossible burden of proof on law enforcement.

¶77 The majority's analysis is bound to affect the interpretation of other lighting equipment statutes involving more than one light, and other statutes that employ the phrases "in proper working condition" or "in good working order."[13]

---

[13] For instance, there are at least 11 statutes in addition to Wis. Stat. § 347.13 that use the phrase "good working order." See Wis. Stat. §§ 30.62, 48.658, 283.31, 285.30, 347.14, 347.36, 347.38, 347.42, 348.15, 350.055(1m) (2013-14), 350.095.

13

¶78 Because the court has diluted the meaning of these phrases, it has seriously impaired law enforcement's ability to stop vehicles to alert the drivers of equipment defects. Of course these stops sometimes serve other purposes. Now, these purposes are in jeopardy because of the confusion created by the court's decision.

¶79 Now that law enforcement officers are precluded from pulling over vehicles with flawed tail lamps if the tail lamps are visible from 500 feet, there is likely to be a bonanza for litigants seeking to challenge motor vehicle stops. The uncertainty in the law will create difficulties for law enforcement and new burdens on circuit courts.

¶80 In my view, this court is making a mistake. It should be providing a clear, commonsense, easy-to-understand standard: if a tail light or brake light is out, the tail lamp or stop lamp is not in good working order.

¶81 For the foregoing reasons, I respectfully dissent.

¶82 PATIENCE DRAKE ROGGENSACK, J. *(dissenting).* For purposes of this dissent, I assume, arguendo, that the majority opinion's conclusion that Antonio Brown's tail lamp was in "good working order" under Wis. Stat. § 347.13(1) is correct. I write in dissent to explain why the majority opinion's conclusion that "an officer's mistake of law is not sufficient grounds for a stop" is not correct.[1] See State v. Longcore, 226 Wis. 2d 1, 9, 593 N.W.2d 412 (Ct. App. 1999). I conclude that the legality of a stop depends on whether under the totality of the circumstances a reasonable officer could have believed that a law violation was occurring. See United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) (a search is valid when "an objectively reasonable police officer could have formed a reasonable suspicion that [a defendant] was committing a . . . violation"). Therefore, "in mistake cases[,] the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005). I further conclude that under the totality of the circumstances a reasonable officer could have believed that Brown's tail lamp violated § 347.13(1). Accordingly, I would reverse the decision of the court of appeals, and I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶83 On the evening of July 3, 2010, Milwaukee police officers Michael Wawrzonek and William Feely were patrolling an

---

[1] Majority op., ¶25.

area near Capitol Drive as part of an effort to "saturate areas that are targeted" by armed robbers. Both officers testified that they observed a 1977 Buick Electra with one panel of the driver's side tail lamp, which had three panels, not illuminated. They pulled the vehicle over based on what they described as a "defective tail light."

¶84 After stopping the car, Officer Feely approached the vehicle and noticed Brown, who was sitting in the back seat, kick a small wooden object under the passenger seat. He ordered all of the occupants out of the car, and ultimately recovered a .38 Taurus revolver from under the front seat.

¶85 The State charged Brown with felony possession of a firearm. Brown moved to suppress all evidence obtained from the stop because officers lacked probable cause to stop the car.

¶86 The circuit court denied the motion, finding that the officers' observation of the unlit panel justified the stop. In denying Brown's motion for post-conviction relief, the circuit court reiterated that stopping the car was proper because the officers "believed that the taillight was out." Even if it is "later to be shown that somehow that . . . light is supposed to not be on at that time," the circuit court reasoned that would not be "a fatal flaw in the stop itself."

¶87 The court of appeals reversed. It concluded that "[a] tail lamp with one of three light bulbs unlit does not violate Wis. Stat. § 347.13(1) when it otherwise meets the statutory definition of a tail lamp." State v. Brown, 2013 WI App 17, ¶21, 346 Wis. 2d 98, 827 N.W.2d 903. Because "[t]he officers

2

mistakenly believed that the law required all of the tail lamps light bulbs to be lit; and 'a lawful stop cannot be predicated upon a mistake of law,'" it held that the evidence should have been suppressed. Id. (quoting Longcore, 226 Wis. 2d at 9).

¶88 We granted the State's petition for review, which asks us to decide whether the officers had probable cause or reasonable suspicion to stop Brown's car and whether the officers had reasonable suspicion to search Brown's car. We asked for additional briefing on the following issues:

> (1) whether the officer had reasonable suspicion to stop Brown's vehicle because the officer believed that Wis. Stat. § 347.13(1) was violated when not all the tail light bulbs on Brown's vehicle were working; [and]

> (2) whether, assuming an officer makes a good faith mistake of law on which the officer makes a traffic stop . . . that mistake of law nevertheless require[s] reviewing courts to conclude that the stop was not lawful.

## II.  DISCUSSION

### A.  Standard of Review

¶89 This case is about the legality of a traffic stop, which is constitutional if supported by probable cause or reasonable suspicion. State v. Anagnos, 2012 WI 64, ¶20, 341 Wis. 2d 576, 815 N.W.2d 675. We evaluate a stop according to two steps. "First, we review the circuit court's findings of historical fact under the clearly erroneous standard." Id. at ¶21. Next, "we review independently the application of those facts to constitutional principles." State v. Post, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634.

3

### B. Lawfulness of Stop

### 1. Introduction

¶90 The majority opinion concludes that "an officer's mistake of law is not sufficient grounds for a stop."[2] See also Longcore, 226 Wis. 2d at 9. The majority opinion string-cites cases from other jurisdictions that have concluded that an officer's mistake of law cannot sustain a stop.[3] The majority opinion reasons that admitting evidence obtained based on a mistake of law "would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey."[4] Because officers' understanding of Wis. Stat. § 347.13(1),[5] which is contrary to the majority opinion's interpretation herein, provided the sole basis for the

---

[2] Id., ¶25.

[3] Id.

[4] Id., ¶24 (quoting United States v. McDonald, 453 F.3d 958, 962 (7th Cir. 2006)) (further citation omitted).

[5] Wisconsin Stat. § 347.13(1) provides in relevant part as follows:

> No person shall operate a motor vehicle . . . during hours of darkness unless such motor vehicle . . . is equipped with at least one tail lamp mounted on the rear which, when lighted during hours of darkness, emits a red light plainly visible from a distance of 500 feet to the rear. No tail lamp shall have any type of decorative covering that restricts the amount of light emitted when the tail lamp is in use. No vehicle originally equipped at the time of manufacture and sale with 2 tail lamps shall be operated upon a highway during hours of darkness unless both such lamps are in good working order.

4

stop in this case, it suppresses all evidence obtained from the stop.

¶91 I do not agree that an officer's mistake of law renders a search per se unreasonable. A statute may be ambiguous or unclear so that an objectively reasonable officer could form a reasonable belief that a violation was occurring, even when it was not. In that instance, I would uphold the search. While the majority opinion's circuit-counting shows that this may be a minority position, I nonetheless conclude that it is the conclusion the law requires for the reasons I now explain.

## 2. General Fourth Amendment principles

¶92 The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [that] provision." Whren v. United States, 517 U.S. 806, 809-10 (1996); see State v. Popke, 2009 WI 37, ¶11, 317 Wis. 2d 118, 765 N.W.2d 569. A traffic stop is reasonable, and therefore constitutional, if: (1) an officer has probable cause to believe a law violation has occurred; or (2) an officer has reasonable suspicion that a crime is about to be or has been committed. Whren, 517 U.S. at 810; Terry v. Ohio, 392 U.S. 1, 22 (1968). "Taken together, then, Terry and Whren stand for the proposition that a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an

5

officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006).

¶93 Evidence obtained in violation of the Fourth Amendment may be suppressed under the exclusionary rule. Weeks v. United States, 232 U.S. 383, 398 (1914); Hoyer v. State, 180 Wis. 407, 417, 193 N.W. 89 (1923). The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).[6] By preventing the use of illegally obtained evidence, it not only deters unconstitutional police conduct, but also protects the integrity of the judicial process by refusing to sanction unlawful searches. State v. Knapp, 2005 WI 127, ¶79, 285 Wis. 2d 86, 700 N.W.2d 899.[7]

¶94 In some instances, "the substantial social costs of excluding relevant evidence" obtained illegally outweigh "the benefit of deterring future police misconduct" produced by the rule. State v. Eason, 2001 WI 98, ¶31, 245 Wis. 2d 206, 629 N.W.2d 625; accord Leon, 468 U.S. at 907-09. We therefore have recognized a good-faith exception to the exclusionary rule in

---

[6] See also Conrad v. State, 63 Wis. 2d 616, 636, 218 N.W.2d 252 (1974) ("The exclusionary rule is a judge-made one in furtherance of conduct that courts have considered to be in the public interest and to suppress conduct that is not.").

[7] But see id. at 635 (questioning the effectiveness of the exclusionary rule to accomplish its objectives.)

some circumstances. Eason, 245 Wis. 2d 206, ¶28. We recently explained our approach to the exclusionary rule and its exceptions as follows:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

State v. Dearborn, 2010 WI 84, ¶36, 327 Wis. 2d 252, 786 N.W.2d 97 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)).

¶95 For example, when an officer reasonably relies on a warrant issued by an independent magistrate, but the warrant is later held to be invalid, evidence seized in reliance on that warrant may nonetheless be admissible. Eason, 245 Wis. 2d 206, ¶3; Leon, 468 U.S. at 922. In Eason, we explained that in such a situation, the exclusionary rule would not serve its purpose of deterring police misconduct because no misconduct occurred. Eason, 245 Wis. 2d 206, ¶55. Although it might later be discovered that an officer had no legal basis for a search because the warrant on which the officer relied was defective, the officer nonetheless could have acted reasonably. Id. at ¶3. Because there is "no real benefit in regard to deterrence, the social cost of excluding relevant evidence . . . [is] the determining factor." Id. at ¶58.

¶96 Suppression is likewise not required when an officer relies in good faith on a substantive criminal statute that is later held unconstitutional, Michigan v. DeFillippo, 443 U.S.

7

31, 39-40 (1979), or "when the officer reasonably relies on clear and settled precedent," Dearborn, 327 Wis. 2d 252, ¶46. See also Davis v. United States, __ U.S. __, 131 S. Ct. 2419, 2423-24 (2011). There again, because the officer is acting reasonably, "the exclusionary rule would have absolutely no deterrent effect on officer misconduct, while at the same time coming with the cost of allowing evidence of wrongdoing to be excluded." Dearborn, 327 Wis. 2d 252, ¶44.

¶97 And finally, when the basis for a traffic stop is reasonable suspicion that criminal activity is afoot, the fruits of the stop may be used against a defendant when the officer's belief is reasonable, even if he is wrong and the defendant did not actually commit an offense. United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996). "The touchstone of the Fourth Amendment is reasonableness" because only unreasonable seizures are prohibited. United States v. Knights, 534 U.S. 112, 118-19 (2001). Therefore, an officer's conduct is examined to determine whether it was reasonable.

### 3. Mistakes of fact and law

¶98 Other jurisdictions allow the use of evidence obtained from a stop based on a mistake of fact.[8] In other words, "an

---

[8] E.g., United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006) ("mistakes of fact are rarely fatal to an officer's reasonable, articulable belief that an individual was violating a traffic ordinance at the time of a stop"); United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stopped based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment."); United States v. Cashman, 216 F.3d 582, 587 (7th Cir. 2000) ("the Fourth Amendment requires only a reasonable assessment of the facts, not a perfectly accurate one").

officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." Delfin-Colina, 464 F.3d at 398. This is so "because of the intensely fact-sensitive nature of reasonable suspicion and probable cause determinations." United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003). When an officer is mistaken as to whether observed conduct is a violation, the law is less settled.

¶99 The majority opinion string-cites cases that have not allowed an officer's mistake of law to serve as the basis for a stop.[9] The majority opinion asserts that "[a]n officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law." United States v. McDonald, 453 F.3d 958, 961 (7th Cir. 2006). Under that view, "[i]t makes no difference that an officer holds an understandable or 'good faith' belief that a law has been broken." Id. at 961-62. Other jurisdictions adopt a somewhat softer approach under which "'[s]tops premised on a mistake of law . . . are generally held to be unconstitutional' . . . [but] [a] stop is lawful despite a mistake of law . . . if an objectively valid basis for the stop nonetheless exists." United States v. Booker, 496 F.3d 717, 722 (D.C. Cir. 2007) (quoting United States v. Coplin, 463 F.3d 96,

---

[9] Majority op., ¶25.

101 (1st Cir. 2006));[10] see Delfin-Colina, 464 F.3d at 399 ("In situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision."). The majority does not discuss the reasoning of contrary authority that I conclude is persuasive.

¶100 In some jurisdictions, "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an

---

[10] The United States Supreme Court vacated the judgment in Booker and remanded to the district court for further consideration in light of Arizona v. Gant, 556 U.S. 332 (2009). Booker v. United States, 556 U.S. 1218 (2009). The D.C. Circuit's holding regarding stops based on mistakes of law, however, remains good law. See United States v. Williams, 878 F. Supp. 2d 190, 200 n.4 (D.D.C. 2012). Prior decisions of the D.C. Circuit on the same point also remain in tact. United States v. Southerland, 486 F.3d 1355, 1359 (D.C. Cir. 2007) (stop was lawful "even assuming [officers] were mistaken that the law required display of the front plate on the bumper"); United States v. Bookhardt, 277 F.3d 558, 565 n.9 (D.C. Cir. 2002) (where an independent valid ground for an arrest exists, there is no reason to distinguish between arrests "where the crime charged was not actually a crime" and arrests "in which the charged offense was a crime but the officer lacked probable cause to believe it had been committed").

objectively reasonable one." Smart, 393 F.3d at 770.[11]  That is, there is "no constitutional requirement to distinguish between mistakes of fact and mistakes of law" and an officer's mistake of law is not per se unreasonable.  State v. Heien, 737 S.E.2d 351, 358 (N.C. 2012); see also United States v. Southerland, 486 F.3d 1355, 1359 (D.C. Cir. 2007) (concluding a stop was lawful, even assuming the officers were mistaken about what the law required, because their interpretation of the law was objectively reasonable under the circumstances).

¶101 One reason for concluding that a stop can be reasonable notwithstanding a mistake of law is that determinations about the validity of traffic stops are not "to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999).  Because courts "should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney," it is possible that an officer could form a reasonable, yet mistaken, understanding of the law.  Id.  In

---

[11] See also Harrison v. State, 800 So. 2d 1134, 1139 (Miss. 2001) ("deputies had probable cause to stop Harrison, even though it was based on a mistake of law"); DeChene v. Smallwood, 311 S.E.2d 749, 751 (Va. 1984) ("an arrest resulting from a mistake of law should be judged by the same test as one stemming from a mistake of fact"); McConnell v. State, 374 S.E.2d 111, 113 (Ga. Ct. App. 1988) ("If the officer acting in good faith believes that an unlawful act has been committed, his actions are not rendered improper by a later legal determination that the defendant's actions were not a crime according to a technical legal definition or distinction determined to exist in the penal statute.").

those situations, "[a] post hoc judicial interpretation of a substantive traffic law does not determine the reasonableness of a previous traffic stop within the meaning of the state and federal constitutions." Heien, 737 S.E.2d at 357.

¶102 I conclude that a traffic stop is valid when an officer reasonably believes that a law has been or is about to broken, notwithstanding "a later legal determination that the defendant's actions were not a crime according to a technical legal definition or distinction." McConnell v. State, 374 S.E.2d 111, 113 (Ga. Ct. App. 1988). As the Eighth Circuit explained, "neither mistake of law nor mistake of fact renders a traffic stop illegal so long as the officer's actions were objectively reasonable in the circumstances." United States v. Bueno, 443 F.3d 1017, 1024 (8th Cir. 2006). Accordingly, when a statute is either ambiguous or unclear so that an objectively reasonable officer could have believed that a violation was occurring, and that belief turns out to be incorrect, I would uphold the search.

¶103 This approach is consistent with the cornerstone of our Fourth Amendment jurisprudence: law enforcement must act reasonably. Reasonable suspicion does not involve a technical analysis. As with probable cause, it invokes "the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." See Brinegar v. United States, 338 U.S. 160, 175 (1949). While it is true that, as a matter of policy, courts should not destroy incentives for officers to "properly understand the law," I

12

nevertheless conclude that an officer can make an objectively reasonable mistake of law. This is particularly true where, as here, members of this court reasonably interpreted Wis. Stat. § 347.13(1) and came to contradicting constructions[12] and the law at issue is a traffic code provision that has not been previously interpreted in a published decision.[13]

¶104 There are several arguments against this approach that merit discussion. First, some courts say that "[t]o create an exception here would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." McDonald, 453 F.3d at 962 (quoting United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000)). Additionally, "if officers are allowed to stop vehicles based upon their subjective belief that traffic laws have been violated even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops [could] seem[] boundless and the costs to privacy rights excessive." United States v. Lopez-Valdez, 178 F.3d 282, 289 (5th Cir. 1999). And finally, the rule excluding evidence from stops based on mistakes of law aligns with the principle that courts should not use a statute's

---

[12] See Prosser, J., dissenting, ¶73.

[13] In an unpublished decision, the court of appeals held that "[a] tail lamp with a burnt out bulb cannot be said to be 'in good working order.'" State v. Olson, No. 2010AP149-CR, unpublished slip op., ¶12 (Wis. Ct. App. Aug. 5, 2010).

13

ambiguity or vagueness against a defendant. Chanthasouxat, 342 F.3d at 1278-79.

¶105 Criticism about the incentives this "boundless" rule would create are grounded in a misunderstanding of the proper inquiry. The question is not whether a particular officer made a mistake of law. Rather, it is whether, under a totality of the circumstances an objectively reasonable officer could have understood the law in such a way. The stopping point is reasonableness. Because a mistake of law must be reasonable, this approach does not invite abuse.

¶106 As to the fact that sustaining a search premised on a mistake of law has the effect of using an ambiguity against a defendant, I agree with the following assessment of the North Carolina Supreme Court:

> [T]he reasonable suspicion standard does not require an officer actually to witness a violation of the law before making a stop. That rule generally applies regardless of the particular substantive law at issue, and results in part because Terry stops are conducted not only to investigate past crime but also to halt potentially ongoing crime, to thwart contemplated future crime, and, most importantly in these circumstances, to protect the public from potentially dangerous activity.

Heien, 737 S.E.2d at 356-57 (citations omitted). I likewise conclude that "because we [should be] concerned for maintaining safe roadways, we [should] not want to discourage our police officers from conducting stops for perceived traffic violations." Id. at 357.

¶107 I therefore conclude that when an officer's mistake of law is reasonable, the costs of excluding evidence are not

14

outweighed by the benefit of deterrence. See Eason, 245 Wis. 2d 206, ¶31. A reasonable mistake of law is, by definition, not the kind of police misconduct the exclusionary rule aims to deter. It is not the result of deliberate misconduct, recklessness, or grossly negligent performance of duty. See Dearborn, 327 Wis. 2d 252, ¶36. It is an objectively reasonable interpretation that a later legal determination declares incorrect. In those situations, I see no reason to distinguish between mistakes of law and fact, and would uphold a traffic stop if under the totality of the circumstances the officer's interpretation of the law is objectively reasonable.

### 4. Application

¶108 I conclude that the officers acted reasonably notwithstanding the majority opinion's determination that Wis. Stat. § 347.13(1) does not require every panel in a tail lamp to be lit. Section 347.13(1) requires a tail lamp to be in "good working order." Although I assume, arguendo, that a tail lamp is in good working order when it is visible from 500 feet, a reasonable officer could have believed otherwise. In other words, at the time of the stop, "good working order" was ambiguous and the officers acted reasonably. See Teschendorf v. State Farm Ins. Cos., 2006 WI 89, ¶20, 293 Wis. 2d 123, 717 N.W.2d 258 ("[a] statute that is unambiguous in one context may be ambiguous in another").

¶109 To explain further, a tail lamp is "a device to designate the rear of a vehicle by a warning light." Wis. Stat. § 340.01(66). The individual panels of a tail lamp generally

15

function together as a unitary device. The majority opinion concludes that the device is functional when the light it emits can be viewed from a distance of 500 feet.[14] It takes no great leap of logic to conclude that an unlit panel might impair the function of the lamp. As Justice Prosser explains, "it is hard to imagine that a tail lamp or a stop lamp that has defective lights can be described as being 'in proper working condition.'"[15] Put differently, a reasonable officer could have suspected that the unlit panel in Brown's tail lamp violated Wis. Stat. § 347.13(1) because an unlit panel could render the tail lamp less visible, or even invisible, from a distance of 500 feet.[16]

¶110 I also note that the court of appeals has previously interpreted Wis. Stat. § 347.13(1) differently than the majority opinion does today. In State v. Olson, No. 2010AP149-CR, unpublished slip op. (Wis. Ct. App. Aug. 5, 2010), an officer observed "a slow moving vehicle equipped with four tail lamp bulbs, one of which was burnt out" and stopped the vehicle. Id. at ¶2. The court of appeals upheld the stop, concluding that "[a] tail lamp with a burnt out bulb cannot be said to be 'in good working order.'" Id. at ¶12. "Though not dispositive, the fact that [courts] reached contradictory interpretations,

---

[14] Majority op., ¶33.

[15] Prosser, J., dissenting, ¶73.

[16] Moreover, the record does not indicate whether the tail lamp was visible from a distance of 500 feet. It is possible then, given the record before us, that the tail lamp violated Wis. Stat. § 347.13(1).

16

despite both courts concluding that the statute was clear, is indicative of ambiguity." Teschendorf, 293 Wis. 2d 123, ¶19.

¶111 The Mississippi Supreme Court upheld a stop based on a similar mistake of law to the one in the present case. In Moore v. State, 986 So. 2d 928 (Miss. 2008), an officer stopped a vehicle for having only one working tail lamp. Id. at 929. There, the court upheld the search even though it was "clear [to the court of appeals] that what the police observed did not constitute a violation of the cited traffic law." Id. at 931 (citation omitted). The officers' mistake in the present case is equally reasonable.

¶112 The majority cites to two cases in support of its conclusion that the officers acted unreasonably because the tail lamp was functional and therefore in good working order: Kroft v. State, 992 N.E.2d 818 (Ind. Ct. App. 2013) and Vicknair v. State, 751 S.W.2d 180 (Tex. Crim. App. 1986).[17] In Kroft, an officer stopped a vehicle with a dime-sized hole in the plastic cover of a tail lamp. Kroft, 992 N.E.2d at 820. Rejecting the State's argument that the tail lamp was not in good working order, the court concluded that "there [wa]s simply no evidence [the vehicle] posed any danger to motorists approaching [the vehicle] from behind" and the officer "did not testify that he had trouble spotting [the vehicle] from behind." Id. at 822. Vicknair involved a similar defect, a cracked tail lamp. Vicknair, 751 S.W.2d at 187. There, the court concluded that

---

[17] Majority op., ¶32.

the device was in good working order because it was still visible from the requisite distance. Id. at 189-90.

¶113 These cases are easily distinguished. Unlike in Kroft and Vicknair, the defect in the present case implicates the function of a tail lamp, which the defects in Kroft and Vicknair did not. Here, the totality of the circumstances on July 3, 2010, could have led a reasonable officer to suspect that Brown's vehicle violated the law because a panel in the tail lamp was not functioning.

### III. CONCLUSION

¶114 For purposes of this dissent, I assume, arguendo, that the majority opinion's conclusion that Brown's tail lamp was in "good working order" under Wis. Stat. § 347.13(1) is correct. I write in dissent to explain why the majority opinion's conclusion that "an officer's mistake of law is not sufficient grounds for a stop" is not correct.[18] See Longcore, 226 Wis. 2d at 9. I conclude that the legality of a stop depends on whether under the totality of the circumstances a reasonable officer could have believed that a law violation was occurring. See Martin, 411 F.3d at 1001 (a search is valid when "an objectively reasonable police officer could have formed a reasonable suspicion that [a defendant] was committing a . . . violation"). Therefore, "in mistake cases[,] the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." Smart, 393 F.3d at 770. I further conclude that under the totality of the circumstances a reasonable

---

[18] Id., ¶25.

officer could have believed that Brown's tail lamp violated § 347.13(1).

¶115 Accordingly, I would reverse the decision of the court of appeals, and I respectfully dissent from the majority opinion.

¶116 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.